**Gerald D.W. North** (*Pro Hac Vice Application to be filed*)
Gerald D.W. North & Associates
125 S. Wacker Dr., Suite 1000
Chicago, IL  60606
Email:  northlaw2@yahoo.com
Tel: (831) 224-0007

**Dennis L. Hall** (*Pro Hac Vice Application to be filed*)
Dennis L Hall, Attorney, pllc
3033 North Central, Suite 810
Phoenix, Arizona 85012
Email: dennis@dlhall.net
Tel: (480) 596-4045

**Cari A. Cohorn** (SBN 249056)
Cohorn Law
100 Pine St., Suite 1250,
San Francisco, CA 94111
Email: cohorn@cohornlaw.com
Tel: (415) 993-9005
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Paul Mula Jr., a California resident, individually and on behalf of the Ogier Revocable Trust Dated August 7, 2000, and all sub-trusts thereof, and on behalf of the Helene Mula-Stouky Trust Dated November 24, 1997,<br><br>Plaintiff,<br><br>v.<br><br>Helene  Mula-Stouky,  a  California resident, both individually and as former Successor  Trustee  of  the  Ogier Revocable Trust Dated August 7, 2000 and  former  Putative  Trustee  of  the Helene Mula-Stouky Sub-Trust thereof; Alan Mula,  a California resident; Terry | Case No. 5:21-cv-04540-BLF<br><br><br>**AMENDED COMPLAINT**<br><br>**[JURY TRIAL DEMANDED]**<br><br>**Assigned to**<br>**the**<br>**Honorable Beth Labson Freeman** |

Wallace, née Campbell, an Idaho resident; Kristof Biorn, a California resident; Crist, Schulz, Biorn & Shepherd, APC, a California Professional Corporation; Patricia Bye, a California resident, both individually and as current Successor Trustee of the Helene Mula-Stouky Trust Dated November 24, 1997, current Successor Trustee of the Ogier Revocable Trust Dated August 7, 2000, and Conservator of the Conservatorship Estate of Helene Mula-Stouky; Bye & Bye Services, a California Sole Proprietorship; Howard G. Frank, a California resident; Alexandra R. Martin, a California resident; Aaron, Riechert, Carpol & Riffle, APC, a California Professional Corporation; Robert E. Temmerman, a California resident; Temmerman, Cilley & Kohlmann, LLP, a California Professional Corporation; Christine Smith, née Weiss, a California resident, both individually and as Conservator of the Person of Helene Mula-Stouky; and Does 1-100,

Defendants.

Plaintiff Paul Salvador Mula, Jr., aka Paul Mula II ("Paul, Jr.)," on his own behalf and on behalf of the Ogier Revocable Trust dated August 7, 2000 (the "Ogier Trust") and all sub-trusts thereof, and the Helene Mula-Stouky Trust Dated November 24, 1997 (the "Stouky Trust"), for his complaint against Defendants, alleges and complains as follows:

## SUMMARY OF THIS LAWSUIT

1.     This case involves a scheme by certain members of the Mula family, successive trustees and associated professionals, court-appointed conservators and a court-appointed attorney, to acquire control of, and then plunder, pillage, and loot, Paul, Jr.'s deceased grandmother's trust and estate of all assets, the bulk of which were intended for him, in part by comingling those assets with assets in the separate trust of his elderly, conservatee, aunt, and to divert the assets of her trust from named and intended beneficiaries to those selected by them. The plundering of the two trusts not only has harmed the trusts, and the Ogier estate, as a whole, but has had a direct impact on as Paul, Jr. as the primary principal beneficiary of his grandmother's trust and estate; has thwarted the favored intent of both his grandmother and aunt to benefit Paul, Jr.; has substantially depleted his inheritable beneficial interest in his grandmother's trust whose assets were supposed to be accumulated and ultimately distributed to Paul, Jr., and depleted the lifetime income and other inheritable beneficial interests of Paul, Jr.'s half-sister, Sarah Mula.

2.     Rather than honor and uphold their charge and duties as conservators, trustees, and professionals to administer the affairs of the Stouky Trust in a prompt and efficient manner, and cooperate with the named successor trustee of the Ogier Trust to the extent of its provisions for the benefit of Paul, Jr.'s aunt, the Defendants have run the Stouky Trust as their personal fiefdom, wrested control of the Ogier Trust away from the named successor trustee, and completely raided it, deliberately comingling Ogier Trust assets with assets in the Stouky Trust, diverting or disposing of assets in the Ogier and Stouky Trusts intended for Paul, Jr. until now, some sixteen years after Sarah's death,

nearly all of the Ogier Trust assets have been misappropriated or transferred for the administrators' and professionals' personal financial benefit or whims, with the Ogier Trust left dissipated in their wake. As a result of the Defendants' denuding of the Ogier Trust, Paul, Jr. is left with no realistic prospect of any significant distribution of his inheritable beneficial interests in the Ogier Trust and Estate's prior multi-million-dollar net worth, as was his grandmother's express desire set forth in the Ogier Trust and in her will, and, as a result of the Defendants' operation of the Stouky Trust, has also been deprived of specific gifts provided for him by his in that Trust.

3.       Through this suit, Paul, Jr., on his own behalf and on behalf of his grandmother's trust (the Ogier Trust) and all intended sub-trusts that were to be funded by its assets, seeks to hold both the initial successor trustee of the Ogier Trust and the current successor trustee, together with other Defendants who came into control, or exercised control over, the assets of that trust, and those who conspired with them, accountable for the systematic looting of the Ogier Trust, and the sub-trust that was supposed to be established to benefit income beneficiary Helene Mula-Stouky during her life, and ultimately benefit contingent remainder beneficiary Paul, Jr., who was to receive the remaining principal after Helene's death. Because the Defendants' long-term pattern of related wrongful conduct involves the violation of numerous federal, as well as state, criminal statutes, Paul, Jr. brings suit against them pursuant to the civil damage provisions of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§1961 *et seq*. ("RICO"). Further, Paul, Jr. asserts California state law claims against the Defendants for breach of fiduciary duties, conspiracy to breach fiduciary duties, and

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

aiding and abetting breach of fiduciary duties, as well as other California state law claims against specific defendants for  tortious interference with Paul, Jr.'s expectancy of inheritance, legal malpractice, conversion, and unjust enrichment, all of which claims are redressable herein pursuant to this Court's supplemental jurisdiction. He also asserts claims against specified Defendants for violations of the federal Fair Debt Collection Practices Act.

4.      The Defendants herein engaged in multiple schemes to loot the Ogier Trust, each of which involved breaches of their fiduciary duties to the Trust or to Paul, Jr. These several schemes had a common purpose: to deprive Paul, Jr. of his beneficial interest, as the primary beneficiary of the trusts and estates, so that the Defendants could take for themselves assets that were intended to go to Paul, Jr. Over the years, the Defendants have engaged in misleading conduct and other affirmative acts to conceal the existence of these claims from Paul, Jr., including false certifications of notice or service, the fabrication and forgery of documents, false or misleading legal advice, and a refusal to provide Paul, Jr, with information about the assets or status of the Ogier Trust. It was only shortly before the original complaint in this case was filed that any defendant suggested that the assets of the Ogier Trust had been dissipated and the Trust "wound up," albeit without any notice to Paul, Jr., such that it was either no longer solvent or no longer extant. Shortly after the filing of the original complaint herein, the current successor trustee of the Ogier Trust disclosed that the Trust, in fact, has few remaining assets.  Nevertheless, she sought and received permission to dissipate what is left to fund not just Helene's defense, but her own defense and that of Defendants Temmerman, Weiss, and Martin,

retaining a single counsel for all without regard to any conflicts of interest that may exist between or among them. Thus, as a result of the deliberate, systematic, and long-term looting of his grandmother's trust and estate by the Defendants who wrongly acquired and maintained control over them, Paul, Jr.'s inheritance has been dissipated to a point where it soon will be non-existent.

## JURISDICTION AND VENUE

5.    **Jurisdiction.**  This Court has federal question jurisdiction under 28 U.S.C. §1331 and 18 U.S.C.§1964(a), and supplemental jurisdiction of the state law claims under 28 U.S.C. §1367.

6.    **Venue.** Venue is appropriate in this Court because most of the Defendants' acts and transactions constituting violations of RICO, and their related tortious conduct, occurred in this District.

6.1.  **Intradistrict Assignment.**  This action should be assigned to the San Jose division because most of the acts or omissions giving rise to the claims alleged herein occurred within Santa Clara County.

## THE PARTIES

7.    <u>**Plaintiff.**</u>  Paul, Jr. is a citizen of California and a primary or principal beneficiary of the trusts established by his grandmother, Sarah Mula-Ogier ("Sarah"), now deceased, and his aunt, Helene Mula-Stouky ("Helene"), now a conservatee. Paul, Jr. was Sarah's only grandchild and was the intended beneficiary of the bulk of the Ogier Trust. Upon Sarah's death, all but one of the assets of her trust were to be transferred to Helene, not personally but as trustee of a sub-trust to be established for her benefit, to the extent of

any of several specified needs during her life, and otherwise accumulated and ultimately conveyed to Paul, Jr., or to the trustee of a sub-trust to be established for Paul, Jr. if he had not reached age 50 at the time of Helene's death.

8.    **Defendants and Named Co-Conspirators.** All parties listed below were active participants in, and provided knowing and substantial assistance for, the implementation and successful execution of one or more of the fraudulent schemes and the conspiracy involved in this suit.

8.1.    Defendant Helene Mula-Stouky ("Helene") is a citizen of California, and is currently a conservatee. She is Paul, Jr.'s aunt. As successor trustee of the Ogier Trust, upon Sarah's death, Helene was instructed by the terms of the Ogier Trust to establish a sub-trust, to be called the Helene Mula Stouky Trust, that was to contain all but a single asset of the Ogier Trust. Sarah named Helene as the income beneficiary of this sub-trust, to receive income, to the extent of several specified needs, during Helene's lifetime. Sarah instructed that after Helene's death, Paul, Jr. was to inherit all of the remaining principal in the sub-trust outright once Paul, Jr. turned 50 years old. Helene never established said sub-trust, despite the Ogier Trust's terms clearly directing her, as successor trustee, to do so. Instead, Helene commingled the Ogier Trust assets with her own assets in an already extant (albeit identically named) trust, of which she was herself trustee, a trust that had completely different terms and beneficiaries than those set forth in the Ogier Trust. This was after Helene first conspired with her brothers Alan Mula and Paul Mula, Sr. to fraudulently transfer certain assets of the Ogier Trust, designated for Paul, Jr., directly to herself, Alan, and Paul, Sr.

8.2     Defendant Alan Mula ("Alan") is a citizen of California and was a co-beneficiary of a single asset in the Ogier Trust. He is a son of Ogier and brother of Paul, Sr., both now deceased. Unsatisfied with the Ogier Trust's terms stating that he was to inherit only one-third of one specific asset, he engaged in the wrongful conduct set forth herein in connection with the diversion of certain assets in the Ogier Trust designated as specific bequests to the sub-trust intended ultimately to benefit Paul, Jr.

8.3     Paul Mula, Sr. ("Paul, Sr.") is deceased. He was a citizen of California. The Ogier Trust provided that Paul, Sr. was a one-third beneficiary of a single specific asset in the Ogier Trust. Paul, Sr.'s only heir is Sarah Mula, eight years old. She currently stands to inherit one-sixth of the Juanita house. Although Paul, Sr. engaged in the same wrongful conduct as Alan, and personally stole a Mercedes SL Gullwing from his mother's garage worth nearly $600,000 at the time (and more than three times that ten years later), his estate, which was named in the original complaint but was never served, is not a defendant herein.

8.4.     Defendant Christina Smith née Weiss ("Weiss") is a citizen of California and a half-sister of Paul, Jr. She is not a blood relative of either Helene or Sarah. Prior to the intervention of Temmerman and Bye, Weiss was not mentioned in the Ogier Trust, Sarah's will, the Stouky Trust, or Helene's will. After Helene was conserved, Temmerman arranged for Weiss to be named Helene's Conservator of the Person. Notably, Weiss is now designated as a significant beneficiary of assets from the Stouky Trust, which now includes assets originally in the Ogier Trust and intended for Paul, Jr., notwithstanding the fact that Weiss is presumptively disqualified to receive such gifts as Helene's caregiver.

8.5     Defendant Robert E. Temmerman ("Temmerman") is the Court-appointed attorney for Helene. He master-minded and participated in the schemes described herein with Bye and Weiss to deprive Paul, Jr. of the beneficial interest to which he is entitled under the Ogier Trust and the Stouky Trust. In fact, Temmerman has stated that he will do everything in his power to make sure that Paul, Jr. takes nothing from either trust or estate.

8.6     Defendant Temmerman, Cilley & Kohlmann, LLP is the California Professional Corporation that employs Temmerman.

8.7.    Defendant Patricia Bye ("Bye") is the current Court-appointed Conservator of Helene's Conservatorship Estate and the successor trustee of the Stouky Trust. She has occupied these positions since about October 2012. Bye intentionally schemed with Temmerman and Weiss to deprive Paul, Jr. of any beneficial interest in the Stouky Trust or Estate, by seeking to amend and reinstate the Stouky Trust through substituted judgment orders to eliminate specific bequests to Paul, Jr. while granting new bequests to Weiss, a non-blood relative who had never been a beneficiary. In October 2013, about a year later, Bye, with the assistance of Temmerman, acquired control over the Ogier Trust as well. On information and belief, after an extortionate threat of sham litigation secured the resignation of the then successor trustee (who had specifically been named by Sarah), Bye took over as the new successor trustee of the Ogier Trust and has been acting in that capacity ever since. As trustee of the Stouky Trust, Bye came into possession of all of the assets of the Stouky Trust, which included assets of the Ogier Trust that had improperly been comingled and transferred to it by Helene. As the new

trustee of the Ogier Trust, Bye came into possession of the remaining assets not yet taken from it. Despite owing extensive fiduciary duties to both of the remaining beneficiaries of the Ogier Trust - Helene and Paul, Jr. - and the Ogier Trust and Estate themselves, Bye failed to take any steps to correct Helene's failure to establish the separate sub-trust required by the terms of the Ogier Trust, and failed to seek to recover properties that had wrongfully been transferred out of the Ogier Trust.  Instead, Bye further comingled Ogier Trust assets in the Stouky Trust and depleted all remaining Ogier assets not yet taken from the Ogier Trust, so as to render Paul, Jr.'s beneficial interest in the Ogier Trust worthless.

8.8     Defendant Bye & Bye is a California sole proprietorship that employs Bye.

8.9      Defendant Terry Campbell née Wallace ("Campbell") is a California lawyer who now resides in Idaho.  She is the lawyer who drafted the Ogier Trust, the Stouky Trust, and the wills of both Sarah and Helene. She subsequently assisted Helene in fraudulently transferring Ogier Trust assets out of the Ogier Trust and directly to Helene, Paul, Sr., and Alan, contrary to Sarah's express wishes set forth in the Ogier Trust.

8.10    Defendant Kristofer Biorn ("Biorn") is a resident of California and is an attorney to whom Paul, Jr. was referred by Temmerman for advice when Paul, Jr. learned in 2012 of certain fraudulent transfers involving assets of the Ogier Trust that he believed had occurred in 2005. Biorn intentionally or negligently advised Paul, Jr. that any claim was time-barred and failed to disclose the subsequent probate court proceeding

that ratified them. Since the filing of this lawsuit, Biorn has spoliated his invoices to Paul, Jr. by deleting them electronically. The spoliated invoices would reflect the work he purportedly did for Paul, Jr. in 2012.

8.11    Defendant Crist, Schulz, Biorn & Shepherd, APC, is a California Professional Corporation that, employed Biorn in 2012.

8.12    Defendant Howard G. Frank ("Frank") was Bye's attorney in connection with the management of the Stouky Trust, Helene's Conservatorship Estate, and the acquisition and maintenance of control over the Ogier Trust and Estate. He resigned shortly after a hearing on a petition to approve an accounting submitted by Bye in or about September 2019. On information and belief, he resigned because he believed Bye was engaged in unethical conduct.

8.13    Defendant Alexandra Martin ("Martin") is a resident of California and is the replaced Frank as attorney for Bye. She participated in violations of the Fair Debt Collection Practices Act.

8.14    Defendant Aaron, Riechert, Carpol & Riffle, APC,is a California Professional Corporation that employs Martin.

8.15     Does 1-100 are other participants on the Defendants' scheme who may have aided and abetted it.

## THE FACTS

### Background

9.    Paul, Jr.'s claims arise out of the administration of the Ogier and Stouky Trusts over the sixteen years since Sarah's death. The Ogier Trust has improperly been drained of almost

all of its assets. In the first instance, Helene, Paul, Sr., and Alan conspired to transfer to themselves specific Ogier Trust assets; then Helene improperly commingled other Ogier Trust assets with her own assets and those of her own trust (the Stouky Trust); then Temmerman, Bye, and Sarah's step-granddaughter-in-law, Weiss, looted most of the remaining Ogier Trust assets either directly or by further comingling them with Stouky Trust assets. Since she was conserved in 2012, Helene has been under the undue influence of Temmerman, her attorney; Bye, the successor trustee of the Stouky Trust, and Conservator of Helene's conservatorship estate; and Weiss, Conservator of the Helene's person. Commencing in 2013, these defendants wrongfully extended their improper influence to the affairs of the Ogier Trust, a trust that had, and has, never been subject to ongoing probate court supervision, when they forced the successor trustee of the Ogier Trust, who had specifically been named by Sarah, to resign, and installed Bye in her stead.

10.    Sarah Mula-Ogier, Paul, Jr.'s grandmother, was born in 1917, moved to California from Louisiana, and worked for the Del Monte management team at an early age. She later invested in real estate, assembling multiple income and rental properties, stocks, bonds, cash, and personal property holdings. She left a multi-million-dollar estate when she died. Her stock portfolio alone, if it had been accumulated and managed as she directed in the Ogier Trust, should today be worth over $10 million.

11.    Sarah had two sons, Paul, Sr. and Alan, and one daughter, Helene (also known as "Dolly"). Helene and Alan had no children, but Paul, Sr. had a son, Paul, Jr., and, years later, a daughter, Sarah Mula. Paul, Jr, and his half-sister are thus Sarah's only biological grandchildren.

12.    Paul, Jr.'s father and mother were divorced when he was young. Consequentially, he became close to his aunt, Helene Mula-Stouky, who, as noted, had no children.

**Formation of the Ogier and Stouky Trusts**

13.    On or about November 24, 1997, Helene established the Stouky Trust. At that time, the Trust named three beneficiaries: (1) Helene's mother, Sarah; (2) her brother, Paul, Sr. (Paul, Jr.'s father); and (3) her youngest brother, Alan (Paul, Jr.'s uncle).

14.    On August 17, 2000, Sarah formed the Ogier Trust, naming Paul, Jr. as the beneficiary of the bulk of its assets.

**Sarah designates Paul, Jr. as the principal beneficiary of her trust and will**

15.    Sarah named her daughter, Helene, to be her successor trustee and trustee of a sub-trust that she was to establish for Helene's benefit, wherein Helene was the income beneficiary of the sub-trust during Helene's life. Sarah directed that upon Helene's death, the entire principal of the sub-trust was to be distributed outright to Paul, Jr. when he turned 50 years old.

16.    Sarah did not think highly of either of her sons, Paul, Sr. or Alan, and knew that her daughter Helene was independently wealthy. Accordingly, Sarah left but a single property located in Sonora, California to her children, Paul, Sr., Alan, and Helene, to be distributed in three equal shares. The remainder of the Ogier Trust assets were left to the sub-trust for the benefit of income beneficiary Helene, during Helene's lifetime and to the extent of specified needs, and then to principal beneficiary Paul, Jr., upon Helene's death. Some of the Ogier Trust assets left to the sub-trust benefitting Helene as an income beneficiary, and then Paul, Jr. as the remainder beneficiary of the principal, were specifically designated by Ogier. The rest of the Ogier Trust assets that were to be distributed to such sub-trust for Helene's lifetime benefit and then outright to Paul, Jr. were included in the Ogier Trust's "residue."

17.    In the summer of 2005, at the age of 88, Sarah became ill. She died on July 8, 2005. Pursuant to the terms of the Ogier Trust, Sarah left four properties, a Charles Schwab brokerage account that contained a substantial number of shares of Apple, Inc., estimated to have a current

worth over $10 million, and the residue of her estate to the sub-trust benefitting Helene as an income beneficiary during Helene's lifetime, and then ultimately benefitting Paul, Jr., as the principal beneficiary upon Helene's death. The Ogier Trust residue contained such things as a large flawless diamond thought to be worth about $500,000, a Gullwing Mercedes worth nearly $600,000 at the time, china and silver, a grandfather clock, and other like or similar assets.

18.     Sarah provided in the Ogier Trust that upon her death, Helene would become successor trustee and that all of the assets designated for the sub-trust were to be transferred to Helene, as trustee of such sub-trust. The Ogier Trust did not direct Helene to transfer Ogier Trust assets to herself personally, or to herself as trustee of her own trust (the Stouky Trust), which happened to have an identical name to the sub-trust Sarah directed Helene to fund in the Ogier Trust.

19.     Until recently, Paul, Jr. was unaware of the specifics of the trusts and wills his grandmother and aunt had executed.

### The scheme to fraudulently transfer real properties titled in the Ogier Trust and designated for Paul, Jr.

20.     Less than three weeks before she died, Sarah purportedly signed quitclaim deeds for three properties titled in the Ogier Trust and designated by the Ogier Trust's terms to be distributed to the sub-trust for Paul, Jr.'s ultimate benefit. She also purportedly signed a quitclaim deed for a fourth property titled in the Ogier Trust that was to be distributed equally to Helene, Paul, Sr. and Alan pursuant to the Ogier Trust's terms. Ogier's will provided, however, that this fourth property was to be distributed to Paul, Jr. The beneficiaries of these quitclaim deeds were her sons, Paul, Sr. and Alan, and her daughter, Helene. Paul, Sr. and Alan had taken a notary, Rahul Shah, to their mother and had Sarah, on her deathbed, sign the transfer documents by making a "mark" on them.

21.     It is not clear who drafted the quitclaim deeds, but it is clear that the deeds were drafted erroneously. The intended effect of the quitclaim deeds was to remove the four properties from the Ogier Trust, depriving Paul, Jr. of his eventual inheritance of them. It is also not clear if Helene actively participated in these deathbed transfers, but she was an equal beneficiary of them.

22.     At the time of the deathbed transfers, Sarah was suffering from dementia and lacked testamentary capacity. As noted, her signature consisted of a mark.

23.     However, the deeds were ineffective. When Paul, Sr. and Alan attempted to sell one of the properties after Sarah's death, the title company declined the transfer because the quitclaim deed listed Sarah, individually, as the transferor, instead of Sarah, as trustee of the Ogier Trust.

24.     Paul, Sr. and Alan thereafter convinced Helene to retain Campbell. Campbell had drafted Sarah's will and the Ogier Trust in 2000. In early 2006, Campbell assisted Helene, as successor trustee of the Ogier Trust, in filing a Petition for Order Confirming Title to Real Property, requesting that the four properties be confirmed as not belonging to the Ogier Trust, and instead ratifying the four fraudulent quitclaim deeds so that all four properties belonged to Paul, Sr., Alan, and Helene, as tenants in common. Campbell had previously represented Sarah, but now was aiding and abetting Helene in thwarting Sarah's intent by fraudulently transferring assets titled in the Ogier Trust, designated for Paul, Jr.'s ultimate benefit, out of the Ogier Trust and to Paul, Sr., Alan, and Helene, as tenants in common. Campbell was supposed to serve the 2006 Petition in probate court on Paul, Jr., and certified that she did so by mail, but Paul, Jr. never received it. Though Campbell included written consents to the transfer of the properties from Paul, Sr., Alan, and Helene, there was no consent from Paul, Jr., who was the ultimate beneficiary of three of the properties pursuant to the terms of the Ogier Trust. Paul, Jr. had not been contacted and never executed a consent. Nevertheless, the Probate Court granted the petition to allow the transfer of

1    the four properties out of the Ogier Trust and into Paul, Sr., Alan, and Helene's names as tenants

2    in common without notice to Paul, Jr. or Paul, Jr.'s consent.

3        25.    Paul, Jr. never received notice of Helene's petition to allow the four properties to

4    be transferred out of the Ogier Trust and directly to Ogier's three children, in direct violation of

5    the Ogier Trust's terms. In light of Paul, Jr.'s obvious and substantial pecuniary interest in the

6    properties, Paul, Jr. would have objected to the transfers, had he received notice.

7

8        26.    Helene never told Paul, Jr. about the transfer and sale of the four properties that had

9    been designated for him, and Paul, Jr. did not learn about the 2006 order ratifying the 2005 death-

10   bed transfers until June 12, 2019.

11       **Helene provides ongoing personal support to Paul, Jr., making available some of the
12   assets he will eventually inherit from Sarah through the Ogier Trust and Estate, or from
     her, and invests in his tech company, while she allows Paul, Sr. and Alan to convert
13   additional assets of the Ogier Trust**

14       27.    Notwithstanding the foregoing, of which Paul, Jr. was unaware, Paul, Jr. was the

15   principal beneficiary of Helene's own trust and maintained a close relationship with Helene over

16   the years preceding her conservation. Helene, like Paul, Jr.'s grandmother Sarah, willingly

17   provided support and assistance to him. Thus, Helene provided Paul, Jr. the personal use, rent-free,

18   of one of a number of houses she owned and had titled in her trust (the Stouky Trust). When Paul,

19   Jr. re-married and had young children, she provided him with another more appropriately situated

20   house, which she designated for him to inherit. Paul, Jr., expected he would inherit the house in

21   which he was living, and with Helene's knowledge (and her promise to gift the house to him even

22   before she passed), maintained the house and made over $300,000 in improvements to it.

23       28.    When Paul, Jr. started a technology company called Clear-View Technologies, Inc.

24   in late 2006/early 2007, Helene supported it by making investments totaling about $ 1 million over

25   the ensuing five years. Though the investments were not gifts to Paul, Jr., and represented little

26

27

28

more than 10% of the total invested, they represented family support for his venture. This continued a pattern started by Paul, Jr.'s grandmother, Ogier, who had provided $400,000 in funding in 2002 for an earlier business venture of Paul, Jr., through a mortgage loan on a property located at 1633 Juanita Drive, San Jose, that was designated for Paul, Jr. Both Sarah and Helene expressed the view that Paul, Jr, was trying to achieve something, unlike his father and uncle.

29.  From Sarah's death in 2005 until Helene was conserved in 2012, Helene allowed her brothers to continue to steal or convert assets from the Ogier Trust. Notably, this included the theft by Paul, Sr. of a Mercedes SL Gullwing, that was worth nearly $600,000 at the time and nearly three times that 10 years later, but which Paul, Sr. sold for $75,000.

**Helene's support of Paul, Jr. becomes the catalyst for her conservatorship**

30.   In late September 2011, Helene was in the process of arranging for a small additional investment in Paul, Jr.'s company, but, while she was doing so, a bank teller contacted the police, conducted an interview, and determined that nothing untoward had occurred.

31.   A few months later, however, on February 17, 2012, an *ex parte* conservatorship proceeding was commenced against Helene. Temmerman was appointed by the Court to serve as Helene's attorney. A subsequent hearing was held in April 2012, to decide whether to make the conservatorship permanent. The hearing lasted little more than 30 minutes. No witnesses were called, except for roughly three minutes of testimony by Helene, in response to questions by the presiding judge, but a total of three reports were received. One was a report by a County-referred psychiatrist who did not recommend for, or against, conservatorship based on his observations of Helene's mental state. The second was a report by Temmerman, a portion of which was filed under seal. A third, the Court's Investigator's Report, was also filed under seal and remains under seal to this day. Paul, Sr. and Alan appeared through counsel, seeking to be appointed co-trustees of the Stouky Trust, as provided for in the terms of the Stouky Trust itself. Paul, Sr. and Alan also

petitioned to be appointed as co-conservators of the conservatorship estate of their mother, Sarah. They requested an evidentiary hearing, but the request was denied. Although there was no evidence of Helene's mental state sufficient to justify a conservatorship, the probate judge decided to conserve her upon hearing her deny that any elder abuse had occurred; state, in response to a question from the court, that she intended to continue to support Paul, Jr.'s tech venture; and further stated that it was her money and she would do with it as she saw fit. At the same hearing, the probate judge appointed Weiss, a remote step-relative, over several closely-related blood relatives (her two brothers and her nephew, Paul, Jr.) to serve as Conservator of her Person.

**The scheme to extort Paul, Jr. into inaction on his own behalf or that of the Ogier Trust and Estate and the Stouky Trust**

32.     The probate court initially appointed John Kessler to serve as Conservator of the Estate of Sarah and to serve as successor trustee of the Stouky Trust, but Kessler resigned within six months, ostensibly out of concern about potential liabilities. At a hearing on October 31, 2012, he was replaced by Bye. At the same hearing, Temmerman asked the probate court to enter an order allowing all powers of attorney for Weiss and that included a draconian, and incredible, threat to Paul, Jr. stating, in the requested order, that if Paul, Jr. were to instigate any litigation, or contest anything, he would be sued, or prosecuted, for elder abuse:

> The Proposed Temporary Conservator of the Estate have no duty to initiate financial elder abuse litigation against the Temporary Conservatee's nephew, Paul Mula, II, also known as Paul Mula, Jr. If, however, Mr. Mula initiates litigation against any of the parties to this case, including but not limited to the current, former, or future Temporary Conservator of the Person or of the Estate of Helene M. Sarah, any future Probate Conservator of the Person of Helene M. Sarah, any future Probate Conservator of the Person or of the Estate of Helene M. Sarah, any temporary or successor trustee of the Helene Mula Stouky Trust, and Court Investigator involved in this case, any counsel representing any of the above individuals, or any court-appointed counsel representing Helene M. Sarah, Petitioner requests that *the Proposed Temporary Conservator of the Estate be authorized to pursue financial elder abuse litigation, and/or any other litigation that may be appropriate and warranted, against Mr. Mula,* in order

to minimize Mr. Mula's ability to deplete the conservatorship estate and/or the trust estate and/or the true trust estate be made available for pursuit of said litigation and for defense of any litigation initiated by Mr. Mula. (Emphasis supplied).

33.     Once the foregoing order was entered by the probate court, Temmerman had not only managed to turn the court into a kind of "Star Chamber" whose decisions were based on "secret files," essentially indicting Paul, Jr. on unsubstantiated, and false, allegations of elder abuse, without hearing from any witnesses, without according Paul, Jr. a hearing, or opportunity to be heard or confront witnesses, and while making no findings, solely on the strength of secret files, but he had also had set up a near-perfect extortion scheme that consisted of threatening Paul, Jr., under color of law, with immediate retribution in the form of criminal prosecution or civil litigation for elder abuse, funded by the very assets Paul, Jr. was supposed to inherit, if Paul, Jr. sought in any way to protect his own beneficial interests,  Helene's interests, or the interests of his grandmother's trust and estate, or challenged the appointment of a remote non-relative as conservator.

34.     Astoundingly, in a subsequent meeting with Paul, Jr., Temmerman admitted that he knew that *"there was no elder abuse."*

### The scheme to prevent Paul, Jr. from Communicating with Helene

35.     Almost immediately after being appointed as trustee of the Stouky Trust and Conservator of the Estate of Helene, Bye sought, with the help of Temmerman, to alter the Stouky Trust and Helene's will to their liking, and to Paul, Jr.'s detriment. They applied to the probate court for a first amendment to the Stouky Trust that reduced Paul, Jr.'s interest as a beneficiary of the Stouky Trust. Bye, Temmerman, and Weiss also obtained a probate court order preventing or restricting Paul, Jr.'s ability to communicate

with his aunt, such that after 2012, Paul, Jr. was unable to have any meaningful visits with her or discuss the actions taken by Bye, the Court-appointed Conservator of her Estate and the trustee of the Stouky Trust. The defendants would later use the fact that they had prevented meaningful visits as an excuse to further modify the Stouky Trust with a second amendment that further reduced Mula Jr.'s entitlement to assets of the Stouky Trust, and in favor of Weiss, while affording Temmerman and Bye a continued opportunity to overbill be paid out of funds in the Stouky Trust.

**Facts relative to Defendant Weiss**

36.     Paul, Sr. was married three times. Paul, Jr. is the only grandchild of Sarah from Paul, Sr.'s first marriage. Paul, Sr.'s second wife had three children from a previous marriage. Paul, Sr. did not adopt those children. Weiss is one of those children. Paul, Sr. eventually divorced his second wife. He later remarried a third time and had one daughter, Sarah Mula, who is now eight years old. Thus, Paul, Jr., and his baby half-sister, Sarah, are Sarah's only biological grandchildren and Helene's only biological niece and nephew.

37.     In 2012, Weiss, a non-blood relative, was appointed as Conservator of the Person of Sarah, based on false representations that Weiss had a close and loving relationship with Helene.

**The scheme to evict Paul, Jr. from the house he was to inherit**

38.     In late 2012, almost immediately upon being appointed Conservator of Helene's Estate and successor trustee of the Stouky Trust, Bye sought to evict Paul, Jr. from the house Helene had provided him - a property Paul, Jr. was supposed to inherit, and to which Paul, Jr. had made substantial improvements, with Helene's knowledge and in reliance on her promise to gift him the house on an *inter vivos* basis - in an attempt to further intimidate and harm Paul, Jr.

39.     Paul, Jr. had wanted to challenge the conservatorship of his aunt, but he was deterred by the threat of sham elder abuse litigation to be funded with trusts monies. When the conservatorship action to conserve Helene began, Temmerman admitted to Paul, Jr. that he knew that Paul, Jr. had not committed any elder abuse, but nevertheless threatened Paul, Jr. with possible sham prosecution or sham civil litigation for elder abuse if he intervened in the appointment of Bye as Conservator of the Estate of Helene and Weiss as Conservator of the Person of Helene, relying on the extortionate probate court order he had procured. Now Paul, Jr. additionally faced an eviction action.

40.     Paul, Jr. was a young parent working to bootstrap a startup technology company at the time the action to place his aunt into a conservatorship, and take control of her estate and the Stouky Trust, began. Paul, Jr. had very limited resources. The charges made against Mula Jr. – of abusing his aunt when she was voluntarily supporting him with an investment in his company – and the threats of pursuing those allegations unless Paul, Jr. looked the other way and did not oppose Bye and Temmerman's efforts to have his aunt conserved and her estate and trust controlled by Bye and Temmerman, were a major part of their scheme to take control of the substantial assets titled in Helene's name, individually, and the assets of the Stouky Trust, which included assets that were originally Ogier Trust assets, of which the Ogier Trust's terms directed ultimately be distributed to Paul, Jr.

41.     Bye took direct action once she became the Conservator of the Estate of Helene and the trustee of the Stouky Trust, following through with the eviction action against Paul, Jr. After legally seeking to evict Paul, Jr., she finally agreed, in a settlement, that Paul, Jr. could remain in the house indefinitely, pending any sale of the house prior to Helene's death, if necessary to provide for Helene. Thus, a Stipulation and Order entered in *Bye v. Mula* in the Santa Clara Superior Court, Case No. 1-13-CV-239613, dated

February 28, 2013, provides, in pertinent part, that "[Paul, Jr.] and his family may continue to reside in the premises [at 735 Arbor Drive] indefinitely, pending the probate of Helene Mula Sarah's estate, and [the Helene Mula-Stouky Trust] will not ask [Paul, Jr.] to vacate the premises…"

### The renewed scheme to deprive Paul, Jr. of his house and transfer assets intended for him to Weiss

42.     Notwithstanding the February 2013 Stipulation and Order providing for Paul, Jr.'s continued occupancy of his home, in 2019, Temmerman filed a second Petition for Substituted Judgment with the probate court seeking to again amend the Stouky Trust, changing the terms of the Stouky Trust which provided for the specific bequest of the house that Paul, Jr. lived in, and had been living in for years. In the proposed Second Amendment and Restatement of the Stouky Trust, the specific bequest of that house, 735 Arbor Dr., to Paul, Jr. was removed. Bye served Paul, Jr. with a three-day notice to pay rent or immediately give up possession of the property.

43.     At the same time, Temmerman and Bye sought to grant a specific bequest to Weiss of Helene's principal residence, located at 1515 Hamilton Avenue. When Helene was conserved in 2012, Weiss had been named Conservator of the Person of Helene and began acting as Helene's caregiver. As such, Weiss was a presumptively disqualified donee of *inter vivos* or testamentary gifts by Helene. Weiss was provided no specific bequest in the original Stouky Trust, and was not a beneficiary of the Stouky Trust at all, prior to it being amended, but the Stouky Trust had provided that the 735 Arbor property be distributed to Paul, Jr. upon Helene's death, and she had promised to transfer it to him during her life in consideration of the extensive improvements he had made, yet now, Bye, Temmerman, and Weiss were seeking to ensure that the terms of the Stouky Trust be amended so that Paul, Jr. was no longer the sole beneficiary of the 735 Arbor property. Further, Bye, Temmerman, and Weiss arranged for the Stouky Trust's terms to be

1
2
3
4
5

amended in Weiss's favor, with two specific bequests of real property to Weiss. In effect, Temmerman, Bye, and Weiss were substituting their choice of beneficiaries for Helene's clear, documented, and witnessed statements of donative intent that long predated any alleged claim that Helene lacked testamentary capacity.

6
7
8
9
10
11
12
13
14
15
16
17
18
19

44.     Bye and Temmerman managed the conservatorship estate of Helene and the Stouky Trust, selling properties and failing to conserve assets designated for Paul, Jr. They continued to bill the Stouky Trust and Helene's conservatorship estate, collecting substantial fees from the Stouky Trust and Helene's estate for their service of "re-organizing" Helene's trust and will, in contradiction to Helene's well-evidenced and express wishes. They benefitted directly by taking control of Helene's conservatorship estate and the Stouky Trust by amending the Stouky Trust's terms to favor Weiss, with specific new bequests that now consist of two houses in San Jose (1633 Juanita and 1555 Hamilton Way), both of which were remodeled at Stouky Trust's expense, plus a gift of $600,000 in cash, creating a total gift to Weiss valued at approximately $3,600,000. Despite the Ogier Trust specifically bequeathing the Juanita house to the sub-trust for Paul, Jr.'s ultimate benefit, the Juanita house was now titled in the Stouky Trust, with Weiss the sole beneficiary of it pursuant to the proposed amended terms of the Stouky Trust.

20
21
22
23
24

45.     In fact, in their application to the probate court, seeking to give Weiss Helene's personal house while Helene was still alive, Temmerman and Bye referred to Weiss as Helene's "friend," underplaying her role and responsibilities as Conservator of the Person of Helene, and her duties as Helene's caregiver, a position which disqualifies her from receiving gifts from Helene.

25
26
27
28

**The acquisition of control over the Ogier Trust and Sarah's Estate**

46.   In October 2013, less than a year after becoming successor trustee of the Stouky Trust, and conservator of Stouky's conservatorship estate, Bye, with the assistance of Temmerman, acquired control over the Ogier Trust, and Bye became the successor trustee of the that trust as well by forcing the resignation of successor trustee Joanne Fairbanks, now deceased. On information and belief, they did so through threats of sham litigation and the fear of legal liability. Bye has been acting in that capacity since then. As trustee of the Stouky Trust, Bye had come into possession of all of the assets of the Stouky Trust, which by then included assets of the Ogier Trust that had improperly been comingled and transferred to it by Stouky. Now, as the new successor trustee of the Ogier Trust, Bye came into possession of the remaining assets not yet taken from the Ogier Trust. Despite owing extensive fiduciary duties to all beneficiaries of the Ogier Trust and the Stouky Trust, Bye failed to take any steps to correct Helene's failure to establish the separate sub-trust required by the terms of the Ogier Trust. Instead, Bye sought to deplete the remaining assets not yet taken from the Ogier Trust, leaving Paul, Jr.'s beneficial interest in the Ogier Trust worthless. Further, Bye intentionally schemed with Temmerman and Weiss to deprive Paul, Jr. of any inheritance or beneficial interest in the Stouky Trust by amending and reinstating the Stouky Trust through substituted judgments.

**The intentional failure to seek recovery of the deathbed transfers and fraudulent concealment from Paul, Jr. of the existence of a valid claim for their recovery**

47.    Bye and Temmerman were aware that Helene and her brothers, Paul, Sr. and Alan, had, in 2005, sought to fraudulently transfer four significant properties intended for Paul, Jr. from the Ogier Trust to themselves, by inducing Sarah to "sign" deeds to those properties at a time when she clearly lacked testamentary capacity and was about to die.

Although Bye, Temmerman, and Weiss were aware of these fraudulent transfers, they ignored them and took no steps to seek to recover the properties or the proceeds for the Ogier Trust.

48.    Instead, Temmerman sought to conceal any extant claim that Paul, Jr. might have relative to the fraudulent transfers by referring him to Biorn for legal advice in the matter, failing to disclose that Biorn was a close personal friend. Paul, Jr. retained Biorn and paid him $5,000 to advise him of his options. Biorn then advised Paul, Jr., that he could do nothing because the statute of limitations on any claim relating to the 2005 transfers had elapsed. In fact, no statute of limitations had elapsed. The 2005 transfers had been ineffective and were only accomplished after Campbell assisted Helene, Paul, Sr., and Alan in obtaining a court order the following year to allow them.

**The scheme to conceal the fact that the Ogier Trust has been drained of nearly all of its assets and that some of its assets have ended up in the Stouky Trust**

49.  Temmerman's motivation for not seeking to recover the properties, and for concealing from Paul, Jr. that he could have pursued a claim for their recovery in 2012, was his desire to conceal that the assets of the Ogier Trust, ultimately intended for Paul, Jr. alone, had been comingled by Helene in her own trust.

50.  Instead of pursuing the fraudulently transferred parcels, Temmerman, Bye, and Weiss proceeded to dissipate the assets of the Stouky Trust, which, on information and belief, has lost over 40% of its value as the result of improper gifts to Weiss, a disqualified donee, and the exorbitant fees charged by Temmerman and Bye, and

dissipate the assets of the Ogier Trust, which were improperly subjected to control by Temmerman and Bye in 2013.

51.    In 2017, when Paul, Sr. was on his death bed, he told Paul, Jr.: "Don't worry Pauly, everything is in order and you will get everything as Grandma intended." But after Paul, Sr.'s death, when Paul, Jr. attempted to contact Helene about the assets of the Ogier Trust and the Stouky Trust, he found that he was not allowed to talk with her about the trust issues. In fact, Weiss would not allow him to talk with Helene alone. Instead, Paul, Jr. was referred to Bye and Temmerman, both of whom were hostile to the inquiry and would not provide Paul, Jr. with any information or documents. Paul, Jr.'s uncle also stated he would not provide him with any information. And when Paul, Jr. again contacted Bye, she told him she could do whatever she wanted with the Ogier Trust and Stouky Trust assets. She stated that what was going on in the management and administration of the Ogier Trust and the Stouky Trust was none of his business; that she and Weiss were administering the Ogier and Stouky Trusts; and that Paul, Jr. would receive whatever he was owed when he turned 50. When Paul, Jr. asked for an accounting, which she was obligated by statute to provide, Bye merely referred Paul, Jr. to Temmerman. Temmerman refused to provide any information.

**Renewal of the scheme to disgorge Helene's bequest to Paul, Jr. of his home**

52.    Instead, as discussed above, Temmerman filed a petition to make a second amendment to the Stocky Trust in March 2019.  The 2019 second amendment to the Stouky Trust took away the bequest of the 735 Arbor Dr. house to Paul, Jr., giving him only a residual interest in the assets of the Trust, but simultaneously added bequests to

yet two additional houses, including the Juanita house that had been designated by Ogier for Paul, Jr., to Weiss.

53.     Temmerman and Bye thus appeared to succeed in reducing Paul, Jr.'s beneficial interest in the Stouky Trust from being a primary beneficiary of specific bequests, to a 25% beneficiary of any residual interest in the Stouky Trust, with no specific bequests, as a result of the 2012 and 2019 amendments. Temmerman and Bye continued to conceal the fact that many of the Ogier Trust assets had been commingled with the Stouky Trust assets and were being, or had been, dissipated, all to the detriment of Paul, Jr.

**Temmerman tells Paul, Jr.: "If I Have My Way, You Will Get Nothing"**

54.     After Temmerman refused to provide any documents or information to Paul, Jr., Paul, Jr. requested the entire case file from the probate court. He received it - ~2,500 pages, exclusive of both a "secret" file (the Court's Investigator's file) and the "secret" portion of Temmerman's report that had been filed under seal, but which apparently formed the basis for the Court Order appointing Conservators of Helene's Person and Estate - on June 12, 2019.

55.     Paul, Jr., now aware of the 2006 probate court order allowing the fraudulent transfers, opposed Temmerman's March 2019 petition to further amend the Stouky Trust and further reduce Paul, Jr.'s beneficial interests therein. Just before the hearing on the petition for the second amendment, Temmerman confronted him personally on the elevator and told him that he would see to it that Paul, Jr. ultimately inherited nothing. Afraid that Paul, Jr, had recorded his statement, Temmerman then put it on the record,

cosmetically spinning it as follows: "If it were up to me, Paul, Jr. would take nothing because he doesn't visit his aunt."

56.    Paul, Jr. timely appealed the 2019 order allowing the second amendment to the Ogier Trust, but the appeal did not proceed for nearly two years until the 6th District Court of Appeal issued an order in April 2021 to the CEO of the Santa Clara Superior Court to show cause why the record had not been transmitted. The appeal has been briefed by Paul, Jr., but all respondents have defaulted by failing to file an opposition brief.

### Further attempts to evict Mula from his home

57.    In early January, 2021, Bye, through her counsel, Martin, sought to create pressure on Paul, Jr. to accept a settlement by again seeking to evict him from 735 Arbor Dr., falsely asserting that there had been a material breach of the 2013 Stipulation and Order, under which Paul, Jr, continued to reside at 735 Arbor Dr., falsely (and untimely) claiming there had been a misrepresentation in connection with the 2013 Stipulation, and fraudulently seeking some $10,000 of purported "back" expenses and demanding that Paul, Jr. begin paying market rent, the very demand that had been settled in the 2013 Stipulation and Order.

### Temmerman suggests settlement

58.    Shortly thereafter, in May, 2021, Temmerman began a series of monthly settlement discussions with Paul, Jr. Initially, he extended the possibility of settlement, suggesting the immediate transfer of the 735 Arbor Dr. house, the same house he sought to take away in the petition for a second amendment the trust, if Paul, Jr. surrendered his claims to his inheritance. In other words, Temmerman sought to use the very bequest he

had taken away by amendment as a bargaining chip to settle Paul, Jr.'s claims. When Paul, Jr. countered with additional demands, he stated he needed to review the matter with Bye.

59.     Settlement discussions continued, punctuated by approximately one-month delays, until August 4, 2021, when Temmerman abruptly withdrew from the next scheduled settlement conference.

### Temmerman feigns ignorance about the Ogier Trust or its assets

60.     During the settlement discussions that took place between May and August, 2021, Temmerman repeatedly played dumb about the Ogier Trust, claiming he knew nothing about it but vaguely stating that he thought it had been wound up long ago.  But the Ogier Trust had not been "wound up," nor could it have been without notice to beneficiary Paul, Jr. The Ogier Trust is now all but completely drained of assets or funds

61.     Upon Sarah's death in 2005, Helene became trustee of the Ogier Trust and was charged, as such, with establishing a separate sub-trust that benefitted income beneficiary Helene during Helene's lifetime and would be distributed outright to Paul, Jr. if Paul, Jr. was at least 50 years old upon Helene's death. If Paul, Jr. was under 50 years old at the time of Helene's death, the sub-trust was to be distributed to a sub-trust for Paul, Jr.'s benefit, and then outright to him, upon turning 50 years old. Instead, Helene not only failed to form the sub-trust called for by the express terms of the Ogier Trust, but she did nothing to protect Paul, Jr.'s beneficial interest in the sub-trust, assisted her brothers in fraudulently transferring property out of the Ogier Trust, and

commingled many of the remaining Ogier Trust assets with her personal assets or assets belonging to her own trust, the Stouky Trust.

62.    Upon Helene's conservation in 2012, the late Joanne Fairbanks became the successor trustee of the Ogier Trust, but she soon resigned "on advice of counsel," possibly because she learned that the Ogier Trust assets had been commingled with Helene's personal assets and those of Helene's trust, the Stouky Trust, but mostly as a result of pressure by Temmerman, who communicated with her lawyers. Bye took over her position as trustee of the Ogier Trust without appointment or any other involvement by the probate court, which did not have direct jurisdiction over the Ogier Trust. But far from discharging her obligations as a successor trustee to carry out Ogier's intent and instructions, as set forth in the Ogier Trust, Bye continued to treat the Ogier Trust assets, which were ultimately intended for Paul, Jr., as if they were assets of the Stouky Trust. For example, an investment grade diamond that was part of the residue of the Ogier Trust, ultimately intended for Paul, Jr, is now scheduled as a bequest by Helene in the Stouky Trust to Alan, who actively had participated in the 2005 death-bed transfer scheme. Helene had never inherited the diamond and was never in any position to direct its disposition.

63.    As a result of all the foregoing, the assets of the Ogier Trust, which were to have been placed in a sub-trust for the benefit of income beneficiary Helene, and then distributed to Paul, Jr. upon Helene's death, either outright if he was at least 50 years old upon Helene's death, or to a sub-trust for his benefit until he turned 50, have virtually disappeared. According to Bye, as of June 30, 2021, the total assets of the Ogier Trust

consist of just $109,429.66 in mutual funds. On September 9, 2021, the probate court authorized Bye to use $50,000 of said funds to pay a retainer for counsel to represent Helene, Bye, Temmerman, Weiss, and Martin in this lawsuit before any funds from the Stouky Trust must be used. In other words, since Helene was conserved, Temmerman, Bye, and Weiss - the individuals assigned to oversee the Stouky Trust and Helene's conservatorship estate - have conspired to misappropriate the substantial assets of the Ogier Trust, over which they had no right to exercise control, and have intentionally sought to prevent Paul, Jr. from receiving the benefits intended for him by his grandmother pursuant to the terms of the Ogier Trust. To mask what they have been doing, they first put in place the above-described, court-sanctioned, extortionate threat of elder abuse prosecution or litigation, to extract inaction by Paul, Jr.; then used the repeat threat of eviction and loss of his residence as an additional or substitute extortionate threat; and have also taken refuge behind a court-sanctioned guarantee that they will be compensated for their cost of defense in any litigation Paul, Jr. may instigate (such as this case), out of the very assets he was to have received, in each case seeking to prevent Paul, Jr. from taking any steps to protect his beneficial interests in the Ogier Trust, the Stouky Trust, or Helene's conservatorship estate, while at the same time concealing from him that the assets in the Ogier Trust have been siphoned off.

64. Under California probate court rules, probate administrators and professionals, such as Bye and Temmerman, are allowed to preside over trusts and estates such as the Stouky Trust, and the conservatorship estate of Helene, with little effective supervision over their conduct, and no accountability for their wrongful conduct. The

trust professionals in this case have sold or otherwise disposed of millions of dollars in assets since 2012, have failed to preserve Ogier Trust assets intended for Paul, Jr., have failed to recover Ogier Trust assets that were fraudulently taken, while twice amending the disposition of the beneficial interests in the Stouky Trust to suit their whim, rather than Helene's donative intent; and have misappropriated funds obtained from the sale of Ogier Trust assets and used said unlawfully obtained proceeds in monetary transactions.

65.     Bye and Temmerman are probate professionals who know how to manipulate the California probate court system. They use the probate court as a rubber stamp to sanction their running of large trusts and estates, while paying themselves handsomely.

66.     In this case, these professionals, and the other defendants, knowingly and intentionally engaged, or conspired to engage, or aided and abetted the engagement of, a wrongful and fraudulent scheme to acquire and then maintain control over the substantial assets of the Ogier Trust established by Sarah Mula-Ogier, without color of right, and have mismanaged the assets of the Stouky Trust in order to plunder, pillage, and loot the substantial assets that were in these trusts.

67.     Defendants' Temmerman and Bye's conduct relative to Paul, Jr., as a beneficiary of the Ogier Trust and the Stouky Trust, was actuated by malice or constituted willful misconduct.

68.     As a result of these Defendants' wrongful conduct, the Ogier Trust is apparently now almost wholly depleted, leaving Paul, Jr. unable to receive his promised inheritable beneficial interest in the Ogier Trust.

69.    The acts of each Defendant, as described herein, played an integral role in the implementation and successful execution of the above wrongful schemes, and, at all times relevant to this suit, all Defendants acted with awareness that their role was part of an overall scheme or conspiracy.

70.    All of the Defendants are jointly and severally liable for the full amount of damages caused to Paul, Jr. because each engaged in the affirmative conduct described herein in furtherance of the goals of the conspiracy. Upon joining the conspiracy, each Defendant became liable for the prior conduct of the earlier co-conspirators, and remains liable for the subsequent conduct of Temmerman, Bye, Weiss, and other co-conspirators, until such time as there is a clear and unequivocal renouncement of any further participation in the conspiracy. To date, none of the co-conspirators named as Defendants herein has renounced his or her further participation in the fraudulent schemes described herein.

71.    Plaintiff realleges all preceding and succeeding paragraphs as the basis for each of the following Counts.

## COUNT ONE

**(RICO Violations by Helene, as Successor Trustee of the Ogier Trust; by Temmerman, as counsel to Helene and mastermind of the schemes set forth herein; by Bye, as Successor Trustee of the Ogier Trust, Successor Trustee of the Stouky Trust, and Conservator of the Estate of Sarah; by Weiss, as Conservator of the Person of Sarah, and by All Defendants for aiding and abetting or conspiring with the foregoing Defendants)**

72.    Pursuant to 18 U.S.C. §1962(b), it is unlawful "for any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise . . ." Further, pursuant to 18 U.S.C. §1962(c), it is

unlawful "for any person employed by or associated with any enterprise . . .  to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . ." In addition, pursuant to 18 U.S.C. §1962(d), it is unlawful "for any person to conspire to violate any of the provisions of subsections . . . (b), or (c) of [§19 62]."

73.    The course of conduct described above constitutes violations by Defendants of §§1962(b), (c) and (d) of RICO. The Defendants engaged in a pattern of wrongful conduct involving extortion, mail fraud, wire fraud, money laundering, monetary transactions with unlawful proceeds, interstate racketeering, and interstate transport of misappropriated funds (the "Predicate Acts") to allow them to acquire or maintain an interest in, or control of, the Ogier Trust.  Further, the Defendants combined together to engage in a pattern of wrongful conduct involving the Predicate Acts to conduct or participate, directly or indirectly, in the conduct of the conspiracy to allow them to conduct or participate in the operation of the Stouky Trust, acquire an interest in or control of the Ogier Trust, and thus allow them to plunder, pillage and loot the assets of both the Ogier Trust and the Stouky Trust, with the result that the Ogier Trust is now teetering on the edge of hopeless insolvency, such that it is a foregone conclusion that Paul, Jr. will be unable to receive his promised inheritable beneficial interests under the Ogier Trust, the trust established by Sarah whose donative intent has been thwarted and the assets of her trust looted, and under the Stouky Trust, of which Helene's express intent was amended and substituted for the wishes of Bye, Temmerman, and Weiss though substituted judgment orders.

74. **Predicate Acts.**

74.1. **Mail Fraud.** The conduct of the Defendants described herein constitutes mail fraud in violation of 18 U.S.C. §1341 in that:

(a) the Defendants participated in a scheme or artifice to defraud, or attempt to defraud, the Ogier Trust and all sub-trusts thereto of all Ogier assets, the majority of which were intended by Ogier to be used for the benefit of income beneficiary Helene during her lifetime, and then to be distributed to Paul, Jr.;

(b) the Defendants, or someone associated with the scheme, used the mails or caused the mails to be used, by placing or causing to be placed in an authorized depository for mail a letter intended to be sent or delivered by the United States Postal Service; and

(c) the use of the mails was for the purpose of executing the scheme.

In that regard, the United States mails were used on a regular, continuous and systematic basis in connection with the implementation and execution of the various wrongful schemes set forth above.

74.2. **Wire Fraud.** The conduct of the Defendants described herein constitutes wire fraud in violation of 18 U.S.C. §1343 in that:

(a) the Defendants participated in a scheme or artifice to defraud, or attempt to defraud, the Ogier Trust and all sub-trusts thereto of all Ogier assets, the majority of which were intended by Ogier to be used for the benefit of income beneficiary Helene during her lifetime, and then to be distributed to Paul, Jr.;

1

2

3

4

    (b)   the Defendants, or someone associated with the scheme or artifice, transmitted communications by means of a telephone, computer or fax machine connected to interstate wires for the purpose of executing such scheme or artifice; and

5

6

7

8

    (c)   the Defendants, or someone associated with the scheme or artifice, used a telephone, computer or fax machine connected to interstate wires willfully and with the specific intent to carry out some essential step in attempting to carry out the scheme or artifice to defraud or attempt to defraud Plaintiffs.

9   In that regard, the interstate telephone wires were used on a regular, continuous and

10  systematic basis in connection with the implementation and execution of the various

11  schemes set forth above.

12      74.3. **<u>Money Laundering</u>.** The course of conduct set forth above constitutes

13  violations of 18 U.S.C. §1956(a) in that Defendants Temmerman and Bye:

14

15      (a)   unlawfully obtained proceeds from, or that rightfully belonged to, the trust estates (the "Funds");

16

17

18

19

20

21

    (b)   was involved in (i) a transaction which in any way or degree affected interstate commerce (1) involving the movement of Funds by wire or other means, or (2) involving one or more monetary instruments, or (3) involving the transfer of title to any real property; or (ii) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate commerce in any way or degree (a "Financial Transaction"); and

22

23

24

25

26

27

    (c)   knowing that the Funds involved in a Financial Transaction represented the proceeds of some form of unlawful activity, conducted or attempted to conduct a Financial Transaction which in fact involved the proceeds of a violation of 18 U.S.C. §§1341,1343, 1951, 1952 and/or 2314 (the "Specified Unlawful Activity"), (i) with the intent to promote the carrying on of Specified Unlawful Activity; or (ii) knowing that the transaction was designed in whole or in part to conceal or disguise the

28

nature, location, source, ownership, or control of the proceeds of Specified Unlawful Activity.

Since (1) Temmerman and Bye conducted or attempted to conduct a Financial Transaction; (2) which they knew involved the proceeds of some form of unlawful activity; and (3) the unlawful activity in fact constituted a Specified Unlawful Activity, their conduct as set forth above constitutes money laundering in violation of 18 U.S.C.§1956(a).

74.4. **Monetary Transactions With Unlawful Proceeds**. The course of conduct set forth above constitutes violations of 18 U.S.C. §1957 in that Temmerman and Bye:

(a)      unlawfully obtained proceeds from, or that rightfully belonged to, the Ogier Trust or Estate (the "Funds");

(b)   knowingly engaged in or attempted to engage in a monetary transaction (the deposit, withdrawal, transfer, or exchange, in or affecting interstate commerce, of funds or a monetary instrument by, through, or to a financial institution which is engaged in, or the activities of which affect, interstate commerce in any way or degree) in connection with the acquisition of property of a value greater than $10,000; and

(c)   the Funds involved in the acquisition were proceeds of a violation of Specified Unlawful Activity (as defined under 8 U.S.C.§1956).

Since they used proceeds derived from a Specified Unlawful Activity to acquire an ownership interest in and control of the Ogier Trust and Estate, as well as acquire the proceed of numerous other assets of a value in excess of $10,000, and, in connection therewith, used a financial institution which was engaged in, or the activities of which

affect, interstate commerce, Temmerman and Bye's conduct constitutes monetary transactions with unlawful proceeds in violation of 18 U.S.C.§1957.

74.5. **Interstate Racketeering**.

(i) Temmerman and Bye engaged in unlawful activity under 18 U.S.C. §1952 because they engaged in (1) money laundering in violation of 18 U.S.C. §1956; and (2) monetary transactions with unlawful proceeds in violation of 18 U.S.C. §1957 (the "Unlawful Activity").

(ii) Temmerman and Bye used the United States mail and other facilities of interstate commerce with intent to (1) distribute the proceeds of any Unlawful Activity; or (2) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any Unlawful Activity.

(iii) The course of conduct set forth above constitutes interstate racketeering by Temmerman and Bye in violation of 18 U.S.C. §1952.

74.6. **Interstate Transport Of Misappropriated Funds**.

(i) Bye and Temmerman transported, transmitted or transferred in interstate commerce funds of the value of $5,000 or more knowing the same to have been misappropriated, converted or taken by fraud from the Estate.

(ii) Further, they devised a scheme or artifice to defraud money from the Estate, and in connection therewith, transported or caused to be transported in interstate commerce funds having a value of $5,000 or more.

(iii) The course of conduct set forth above constitutes interstate transport of misappropriated funds by them in violation of 18 U.S.C. §2314.

74.7.  **<u>Extortion under Federal Law</u>**.

(i)       Temmerman, Bye, and Weiss obtained property otherwise beneficially belonging to Paul, Jr. by the wrongful use of fear he would be sued or prosecuted for elder abuse, or evicted from his home.

(ii)    Further, Temmerman, Bye, and Weiss, obtained an official act of a public official under color of official right.

(iii)   The conduct set forth above constitutes extortion in violation of 18 U.S.C. § 1951.

74.8.  **<u>Extortion under California Law.</u>**

(i)     Temmerman, Bye, and Weiss obtained property otherwise beneficially belonging to Paul, Jr. by the wrongful use of fear he would be sued or prosecuted for elder abuse, or evicted from his home.

(ii)    Further, Temmerman, Bye, and Weiss, obtained an official act of a public official under color of official right.

(iii)   The conduct set forth above constitutes extortion in violation of Section 518 of California's Penal Code.

74.9.  **<u>Criminal Conspiracy under California Law</u>**.

(i)     Temmerman, Bye, and Weiss agreed to work together to obtain property beneficially belonging to Paul, Jr. by extortion and to perpetrate a scheme or artifice to defraud Paul, Jr.

(ii)   This agreement constitutes a conspiracy in violation of Section 182 of California's Penal Code.

75.   **Pattern of Racketeering Activity**. 18 U.S.C. § 1961 (5) requires at least two acts of racketeering activity, the last of which occurred within ten years after the commission of a prior act of racketeering activity, and may consist of a series of related schemes or predicates extending over a substantial period of time. As described herein, the Defendants engaged in numerous acts of racketeering activity, at least two of which occurred within ten years of each other. The Predicate Acts and other wrongful conduct of the Defendants described herein were related in the sense that they involved the same or similar purposes, results, participants, victims and methods of commission, and did not involve isolated or sporadic events. Further, there was continuity of conduct in that the Predicate Acts and other wrongful activities of the Defendants described herein extended over a considerable period of time and involved conduct with the threat of continuing wrongful activities. All of the alleged racketeering acts were part of related and continuous schemes to loot the trusts and, by extension, the estate, and defeat Sarah's and Helene's donative and testamentary intent that the assets of the trusts ultimately inure to the benefit of Paul, Jr.

76.   **Enterprise**

76.1.  Pursuant to 18 U.S.C. §1962(b), the Defendants have engaged in the pattern of racketeering activity described herein to allow them to acquire and maintain control over the affairs of the Ogier Trust and Estate.

76.2. The Ogier Trust and Estate is itself an "enterprise" affecting interstate commerce within the meaning of 18 U.S.C. §1961(4).

76.3. In the alternative, the individuals formally associated with the Ogier Trust — currently Bye, Temmerman, and Weiss, and previously Helene, Paul, Sr., and Alan — comprise an "association-in-fact" enterprise. These defendants had, or have, a shared lawful purpose of settling the estate and distributing its assets, a shared unlawful purpose of defeating Sarah's donative and testamentary intent to make sure Paul, Jr. receive little, if any, of his inheritance, and had family or legal relationships with one another. The Ogier Estate has existed for over sixteen years – over seven under initial successor trustee Helene, less than a year under successor trustee Fairbanks, and over eight under current successor trustee Bye – giving the association-in-fact of the persons formally associated with it sufficient longevity. Although the particular grouping of participants has evolved over the years, even now the early participants in the association-in-fact enterprise continue to be awarded a "split" of the proceeds from the thefts and conversion of Ogier Trust assets.

76.4. Pursuant to 18 U.S.C. §1962(c), some of the Defendants have conducted or participated, directly or indirectly, in the conduct of the Stouky Trust and Helene's Conservatorship Estate through a pattern of racketeering activity.

76.5. The Stouky Trust and Estate is itself an "enterprise" affecting interstate commerce within the meaning of 18 U.S.C. §1961(4).

76.6. In the alternative, Bye, Temmerman, and Weiss, and the professionals associated with them, comprise an "association-in-fact." They had, or have, a shared lawful purpose of settling the estate and distributing its assets, a shared unlawful purpose of defeating Helene's donative and testamentary intent and making sure that Paul, Jr.

receive little, if anything, of his gifts and inheritance, and had a legal relationship with one another. The Stouky Trust and Helene's Conservatorship Estate have been under the undue influence or control of Temmerman, Bye, and Weiss for over nine years giving the association-in-fact of the persons formally associated with it sufficient longevity.

76.7. The Defendants, and other persons and entities not named as Defendants herein, have also participated in a broader associational enterprise-in-fact affecting interstate commerce. The associational enterprise was devoted to the wrongful and fraudulent purpose of allowing first Helene, Paul, Sr., and Alan, and later Temmerman, Bye, and Weiss, to acquire and maintain control over the affairs of the Ogier Trust and Estate, and allowing Temmerman, Bye, and Weiss to conduct the affairs of the Stouky Trust and Helene's Conservatorship Estate in order to plunder, pillage and loot the assets of both trust estates, thus resulting in the dissipation of the estates and the inability of Paul, Jr. to receive his promised inheritable beneficial interests from the net assets of the trusts and estates. The enterprise has an ongoing organization and functions as a continuing unit. Helene, Paul, Sr, and Alan, Temmerman, Bye, and Weiss, and the other Defendants and other persons and entities not named as Defendants herein, have conducted the affairs of these enterprises through the pattern of racketeering activity described herein. Accordingly, the joining together by Defendants and other persons and entities not named as Defendants herein for the purpose of allowing Defendants (a) to acquire and then maintain control over the affairs of the Ogier Trust and Estate, (b) to divert assets and income out of the Ogier Trust and Estate, outside of probate and in fraud of creditors and/or beneficiaries of the Ogier Trust and Estate or through the Stouky Trust

and Helene's Conservatorship Estate, and (c) to conduct the affairs of the Stouky Trust and Helene's Conservatorship Estate through a pattern of racketeering activity, constitutes an associated-in-fact "enterprise" within the meaning of 18 U.S.C. §1961(4).

76.8. The Defendants participated in varying capacities in the wrongful and fraudulent schemes to allow Defendants to  (a) acquire an interest in, and then maintain control over, the affairs of the Ogier Trust and Estate, (b) divert assets and income out of the Ogier Trust and Estate outside of probate and in fraud of creditors and beneficiaries of the Estate, or through the Stouky Trust and Helene's Conservatorship Estate, and (c) divert assets and income in the Stouky Trust and Helene's Conservatorship Estate from the rightful donees and heirs to donees and heirs not contemplated by Helene. The Defendants willfully associated themselves with the schemes set forth herein and willfully participated in such schemes.  As set forth above, both Helene, Paul, Sr., and Alan, and Temmerman, Bye, and Weiss, and those under their direction, committed numerous fraudulent and wrongful acts which constitute the predicate acts of mail fraud, wire fraud, money laundering, monetary transactions with unlawful proceeds, interstate racketeering, and interstate transport of misappropriated funds.  The Defendants named herein knew about and agreed to facilitate these Defendants' wrongful schemes, and provided knowing and substantial assistance toward the accomplishment of their wrongful goals.  In addition, the Defendants aided or abetted the Predicate Acts described herein.

76.9. Accordingly, pursuant to 18 U.S.C. §1962(d) and 18 U.S.C. §2, the Defendants, as co-conspirators, are liable as principals and co-conspirators.

77.   **Injury**.

77.1. Paul, Jr.'s vested, albeit contingent, right to an inheritance from Ogier is a concrete present property interest. A beneficiary suffers an injury to his or her business or property where, as here, the Defendants' conduct has diminished his or her inheritance after the testator has died, when an estate exists and a beneficiary's interest in that estate has vested. Here, while attempted looting took place prior to Sarah's death, all of the effective looting of the Ogier Trust took place after her death in 2005, when her Estate already existed and Paul, Jr.'s interest had already vested. Paul, Jr. suffered injury because he is no longer able to receive the promised inheritable beneficial interests from the net assets of the Ogier Trust and Estate.

77.2   Some of the Defendants' violations occurred a number of years ago, notably the attempted fraudulent "death-bed" transfers of property, but Defendants' wrongful conduct did not give rise to a claim for relief under 18 U.S.C. §1964(c) until those violations resulted in actual injury to Paul, Jr.'s business or property, and then did not accrue until Paul, Jr. learned of them.  Defendants' affirmative acts and actively misleading conduct fraudulently concealed the existence of a viable cause of action for the 2005 death-bed transfers which were not, in any event, actionable because they were ineffective.  Although Paul, Jr. exercised reasonable diligence by seeking counsel in 2012, his counsel was in bed with the Defendants and Paul, Jr. did not learn that the transfers had been made effective by a fraud on the court in 2006 until June 2019, and filed suit within two years of learning of it, well within the four-year statute of limitations applicable to RICO claims. Defendants also concealed that the Ogier Trust and Estate

was almost insolvent even though Bye owed Paul, Jr. a duty, as the contingent remainder beneficiary, to keep him reasonably informed about the administration of the Ogier Trust and to provide him with requested information relating to his future interest, as provided in California Probate Code ("CPC") §§ 16060-16061. Bye had a duty to keep all beneficiaries, including contingent and remainder beneficiaries, reasonably informed of the trust and its administration, and to communicate information reasonably necessary to enable contingent remainder beneficiaries to enforce their rights under the trust or to prevent or redress a breach of trust. Bye's failure to perform her statutory duties tolled any statute of limitations as to such claims. Even so, a separate accrual rule applies each time a plaintiff such as Paul, Jr. discovers or should have discovered a new injury caused by a RICO violation.

77.3.    As Trustee of the Ogier Trust, Bye owed an independent and direct legal duty to Paul, Jr., which is distinguishable from the duties that she owed to Helene or the Ogier Trust, the breach of which caused harm and damage to the business and property of Paul, Jr.  which is separate and distinct from any harm or damage that was caused to Helene or the Ogier Trust. As Conservator of the Stouky Estate, and as a Trustee of the Stouky Trust, Bye owed an independent and direct legal duty to Paul, Jr., which is distinguishable from the duties that she owed to Helene or the Stouky Trust, the breach of which caused harm and damage to the business and property of Paul, Jr.  which is separate and distinct from any harm or damage that was caused to Helene or the Stouky Trust.

77.4    Paul, Jr. has incurred substantial expense seeking to defend his beneficial interest in the Ogier and Stouky Trusts and to halt the looting of these trusts and estates. A plaintiff may recover legal fees and expenses incurred in an effort to combat a defendant's RICO violations through the legal system, as damages in a civil RICO action. Paul, Jr.'s expenses (the attorneys' fees and other expenses he has incurred and will incur in connection with his efforts to enforce his claims) thus constitute a separate, cognizable injury to his business or property.

78.    Paul, Jr. has thus been injured in his business or property by reason of a violation of 18 U.S.C. §1962. Pursuant to 18 U.S.C. §1964(c), he is entitled to recover from the Defendants treble his actual damages, costs of suit, and reasonable attorneys' fees.

## COUNT TWO

### (Breach of Fiduciary Duties by Bye as Conservator of the Estate of Helene)

79.    As Conservator of the Estate of Helene, Bye owes fiduciary duties to Helene, Conservatee, including, but not limited to, the following:

(a) a duty to prudently manage the property and assets in the conservatorship estate of Helene;

(b) a duty to preserve property mentioned in Helene's estate planning documents;

(c) a duty to pursue claims against others on behalf of Helene when it is in the best interests of Helene's conservatorship estate to do so; and

(d) a duty to consider Helene's previously expressed or current desires concerning any property belonging to the conservatorship estate or the Stouky Trust, unless accommodating those desires would violate a fiduciary

duty to Helene or impose an unreasonable expense on the estate;

80.     The course of conduct set forth above constitutes breaches by Bye of the fiduciary duties that she owes to Helene as Conservator of the Estate of Helene, of which breach of such duties has proximately caused harm and damage to Helene, and as a result, to Paul, Jr.

## COUNT THREE

### (Breach of Fiduciary Duties by Bye as Trustee of the Stouky Trust)

81.     As Trustee of the Stouky Trust, Bye owes fiduciary duties to Helene and all other beneficiaries of the Stouky Trust, including, but not limited to:

(a)    a duty of undivided loyalty;

(b)    a duty to act in good faith in any matter relating to the Stouky Trust;

(c)    a duty to act in the best interests of the Stouky Trust;

(d)    a duty to avoid self-dealing and to not profit at the expense of the Stouky Trust;

(e)     a duty of full disclosure, including a duty to correct and clarify any prior misstatements or omissions of material facts;

(f)    a duty to preserve Stouky Trust assets, including a duty to authorize the payment of real estate taxes on valuable Trust property;

(g)    a duty not to pay claims out of due order as provided under California probate law;

(h)    a duty to not misappropriate and otherwise use Stouky Trust funds, assets, and business opportunities of the Trust for her personal use and financial benefit; and

FIRST AMENDED COMPLAINT              47              Case No. 5:21-cv-04540-BLF

(i)   a duty to administer and settle the affairs of the Stouky Trust
        in good faith and in a prompt and efficient manner.

82.   The course of conduct set forth above constitutes breaches by Bye of the fiduciary duties that she owed to the beneficiaries of the Stouky Trust, and thus to Paul, Jr. as a beneficiary of the Stouky Trust, which proximately caused harm and damage to him.

## COUNT FOUR

### (Breach of Fiduciary Duties by Helene and Bye as Trustees of the Ogier Trust)

83.   As Trustees of the Ogier Trust, Helene and Bye owed or owe fiduciary duties to the beneficiaries of the Ogier Trust, including, but not limited to:

(a)   a duty of undivided loyalty;

(b)   a duty to act in good faith in any matter relating to the Ogier Trust;

(c)   a duty to act in the best interests of the Ogier Trust;

(d)   a duty to avoid self-dealing and to not profit at the expense of the Ogier Trust;

(e)   a duty of full disclosure, including a duty to correct and clarify any prior misstatements or omissions of material facts;

(f)   a duty to diligently pursue, protect and collect for the Ogier Trust only those assets that should have flowed into the Ogier Trust or any sub-trust thereto;

(g)   a duty to not misappropriate and otherwise use Ogier Trust funds, assets, and business opportunities of the Trust for her personal use and financial benefit; and

(h)   a duty to administer and settle the affairs of the Ogier Trust in good faith and in a prompt and efficient manner.

84.     In addition to the foregoing duties, many of which Helene and Bye breached, Helene and Bye owed (or owes) duties to Paul, Jr., as the contingent remainder beneficiary, (1) to act impartially and take both Paul, Jr. and Helene's interests into account; (2) to preserve the Ogier Trust assets; (3) to keep Paul, Jr. reasonably informed about the administration of the Ogier Trust; and (4) to provide Paul, Jr. with requested information relating to his future interest. *See* CPC §§ 16003,16060-16061. Helene failed to perform the first three of these duties. Bye failed to perform the first three of these duties and repudiated the fourth.

85. The course of conduct set forth above constitutes breaches by Helene and Bye of the fiduciary duties that each owed to Paul, Jr., as remainder beneficiary of the Ogier Trust, which proximately caused harm and damage to Paul, Jr.

## **<u>COUNT FIVE</u>**

### **(Aiding and Abetting Breach of Fiduciary Duties by All Defendants)**

86.   All of the Defendants knew that Bye was Conservator of the Estate of Helene, Trustee of the Stouky Trust, and Trustee of the Ogier Trust, and, as such, owed fiduciary duties to Helene and all beneficiaries of the Stouky Trust and the Ogier Trust. As set forth above, Bye breached her fiduciary duties owed to Helene, the beneficiaries of the Stouky Trust, and the beneficiaries of the Ogier Trust, in particular Paul, Jr., as beneficiary of Ogier Trust and beneficiary of the Stouky Trust, which proximately caused harm and damage to him.

87.     Further, all of the Defendants knew that Bye was the trustee of the Stouky Trust, who, as a trustee, owed fiduciary duties to Paul, Jr., as a beneficiary of that trust.

As set forth above, Bye breached the fiduciary duties that she owed to Paul, Jr. which proximately caused harm and damage to him.

88.    The Defendants provided knowing and substantial assistance to Bye in her breach of the fiduciary duties that she owed to the Stouky Trust and thus the fiduciary duties that he owed to beneficiaries of the trust, as well as knowing and substantial assistance to Bye, her breach of the fiduciary duties that she owed to Paul, Jr. as a beneficiary, which proximately resulted in harm and damage to him. Accordingly, the Defendants are jointly and severally liable to Paul, Jr. for aiding and abetting breach of fiduciary duties.

## COUNT SIX

### (Conspiracy to Breach Fiduciary Duties by All Defendants)

89.    All of the Defendants knew that Bye was Conservator of the Estate of Helene, Trustee of the Stouky Trust, and Trustee of the Ogier Trust, and owed fiduciary duties to Helene and the beneficiaries of the Stouky Trust and the Ogier Trust. As set forth above, Bye breached the fiduciary duties that she owed to Helene, the beneficiaries of the Stouky Trust, and the beneficiaries of the Ogier Trust, including the fiduciary duties that she owed to Paul, Jr. as a beneficiary of the Stouky Trust and the Ogier Trust, which proximately caused harm and damage to him.

90.    Further, all of the Defendants knew that Bye was the trustee of the Stouky Trust, who, as a trustee, owed fiduciary duties to beneficiary Paul, Jr. As set forth above, Bye breached the fiduciary duties that she owed to Paul, Jr., which proximately caused harm and damage to him.

91.   All of the Defendants knowingly participated in a common scheme to assist Bye in her breach of the fiduciary duties she owed to Paul, Jr., as set forth above, with a view to the furtherance of a common purpose or design.

92.   The course of conduct set forth above constitutes a combination of two or more persons to do an unlawful act or a lawful act by unlawful means.  Further, there were numerous acts performed by the Defendants as co-conspirators pursuant to the schemes set forth above and in furtherance of the object of the schemes, which proximately resulted in harm and damage to Plaintiffs.  Accordingly, the Defendants are jointly and severally liable to Paul, Jr. for engaging in a conspiracy to breach fiduciary duties.

## <u>COUNT SEVEN</u>

### (Unjust Enrichment by Weiss)

93.   As set forth above, Temmerman and Bye systematically diverted assets from the Ogier Trust and the Stouky Trust, that were intended to go to named beneficiaries, including Paul, Jr., and instead directed them to Weiss in order to procure her cooperation in their unlawful schemes.

94.   Weiss benefited from this wrongful conduct, but to date, has unjustly refused to pay Paul, Jr. for her pro-rata share of the assets that were unjustly converted for her own personal financial benefit. The failure of Weiss to pay for the benefits she unjustly received was to the Paul, Jr's detriment, and thus Weiss has been unjustly enriched at the expense of Paul, Jr.

## COUNT EIGHT

### (Intentional Interference with the Expectancy of an Inheritance by Temmerman and Bye)

95.   As set forth above, Temmerman and Bye systematically diverted assets from the Ogier Trust and the Stouky Trust which were intended to go to Paul, Jr.

96.   Paul, Jr. had an expectancy of an inheritance from the Ogier Trust, as remainder beneficiary. Further, Paul, Jr. had an expectancy of an inheritance from the Stouky Trust, as beneficiary.

97.   Defendants acted with intent to deprive Paul, Jr. of his inheritance expectancy and interfered with Paul, Jr.'s expectancy through tortious conduct directed at him.

98.   The Defendants actions caused, or may have caused, the extinguishment of Paul, Jr.'s expectancy to receive 735 Arbor Dr. as a specific gift from the Trust.

## COUNT NINE

### (Unfair Competition by Temmerman and Bye)

99.   As set forth above, Temmerman and Bye systematically performed acts of unfair competition as a business practice which constituted fraud and deceit in violation of California Business & Professions Code Section 17203.

100.   Temmerman and Bye benefited from their wrongful conduct, but to date, have unjustly refused to pay Paul, Jr. and other beneficiaries for their pro-rata share of assets that they unjustly converted for their personal financial benefit or diverted to others. Their failure to pay for the benefits they unjustly received was to the Paul, Jr.'s detriment, and thus Temmerman and Bye have been unjustly enriched at his expense.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT TEN

### (Violation of Fair Debt Collection Act by Bye and Martin)

101.  As set forth above, Defendants Bye and Martin, directly or indirectly, used false, deceptive, or misleading representations or means, in violation of Section 807 of the Fair Debt Collection Practices Act (the "FDCPA"), 15 U.S.C. § 1692e by making false representations concerning the character, amount, or legal status of Paul, Jr.'s alleged debt, in violation of Section 807(2)(A) of the FDCPA, 15 U.S.C. § 1692e(2)(A); or b.

## COUNT ELEVEN

### (Legal Malpractice by Biorn)

102.  As alleged above, Biorn is an attorney. Temmerman referred Paul, Jr. to Biorn for advice in 2012. Paul, Jr. retained Biorn and paid him $5,000 for this representation.

103.  Biorn failed to use the skill and care that a reasonably careful attorney would have used in similar circumstances, thereby falling below the standard of care. Specifically, Biorn failed to inform Paul, Jr. of the probate court proceedings ratifying the fraudulent property transferred and intentionally or negligently advised him that any potential claims arising out of those transfers were time-barred. In fact, no statute of limitations had elapsed. The 2005 transfers had been ineffective and were only accomplished after Campbell assisted Helene, Paul, Sr., and Alan in obtaining a court order the following year to allow them.

104.  Paul, Jr. sustained damages as a result of Biorn's wrongful conduct.  But for Biorn's negligence Paul, Jr, would have learned of the 2006 probate proceeding and instructed Biorn to move to set it aside as a fraud on the court.

105.    Biorn willfully concealed the facts surrounding his wrongful act(s)/omission(s), a concealment that has continued even after the filing of the original complaint.

### COUNT TWELVE

### (Conversion by Alan, Paul, Sr., Helene, Bye, and Weiss)

106.    As a vested beneficiary of the Ogier Trust, Paul, Jr. had a sufficient ownership interest in the Ogier Trust assets following Sarah's death to support a cause of action for conversion of those assets. Additionally, he brings this count on behalf of the Ogier Trust and the sub-trust that, had the terms of the Ogier Trust been carried out, would have been created.

107.    Defendants knowingly interfered with Paul, Jr.'s property rights, and the property rights of the Ogier Trust and sub-trust, by selling, comingling, and dissipating identifiable personal property, including but not limited to physical property such as the investment grade diamond and the Gullwing Mercedes, and assets within the Charles Schwab investment account, including a substantial number of shares of Apple, Inc.

108.    Paul, Jr. did not consent to these actions and was harmed by them. The harm Paul, Jr. has sustained includes but is not limited to the value of time and money he is being required to expend in attempting to recover the property and/or its fair market value and restore the assets to the Ogier Trust/sub-trust. Defendants' conduct was a substantial factor in causing that harm.

### DAMAGES

109.    The reasonably foreseeable consequences of the Defendants' wrongful conduct as set forth above were not only the systematic diversion of assets, income, and opportunities that should have been distributed to Paul, Jr. in accordance with the desires of as set forth in their trust estates, but also the prospect that the trust estates would be

rendered insolvent or diminish, so that Paul, Jr. would not be able to collect on their inheritances.

110.    Had the Defendants not engaged in the wrongful conduct set forth above, the Stouky Trust and the Ogier Trust could have, and would have in due course, been able to distribute to Paul, Jr., his promised inheritable beneficial interests of the Ogier Trust and the Stouky Trust. As a direct, proximate, and consequential result of the Defendants' wrongful conduct as set forth above, the Ogier Trust is now gutted, with no likelihood of any distribution to Paul, Jr. of his promised inheritable beneficial interest in the net assets of the Trust, and the Stouky Trust will likely be depleted over time, with no distribution to Paul, Jr.

111.    Paul, Jr. has been injured in his business or property, and has suffered direct, proximate and consequential damages as a result of the acts described above (a) in the amounts that the Ogier Trust sub-trust, for the benefit of income beneficiary Helene during her lifetime, and then to Paul, Jr., as provided by the Ogier Trust's terms, would have received, had the sub-trust been funded according to the terms of the Ogier Trust, because of the Defendants' wrongful conduct as set forth above; (b) Paul, Jr.'s inheritable beneficial interest in such sub-trust of the Ogier Trust, upon Helene's death, that he would have been able to receive as the ultimate beneficiary of the net assets of the sub-trust contemplated by the Ogier Trust, but is prevented from doing so because of the Defendants' wrongful conduct as set forth above; (c) Paul, Jr.'s promised inheritable beneficial interests in the net assets of the Stouky Trust estate; and (d) Paul, Jr.'s collection expenses – the attorneys' fees  and  other  expenses incurred by Paul, Jr. in

1
2
3

connection with his efforts to enforce his claims against the Stouky Trust, the Ogier Trust, and the Conservatorship Estate of Helene in the probate court to date.

4
5
6
7
8
9

112.   In addition, because the wrongful acts of the Defendants as described above were willful, intentional, and malicious, or with such a high degree of recklessness that the Defendants knew, must have known, or should have known, that harm would likely result to Paul, Jr., Paul, Jr. seeks an assessment of punitive damages against the Defendants in an amount not less than three times his actual damages.

10

### ATTORNEY'S FEES

11
12
13
14
15

113.   As a result of the acts described above, Paul, Jr. has employed the undersigned attorneys to prosecute this cause.  Pursuant to 18 U.S.C. §1964(c), Paul, Jr. is entitled to recover reasonable attorneys' fees from the Defendants for trial of this cause, plus additional reasonable attorneys' fees for any further trials, hearings or appeals.

16

### PRAYER

17
18
19
20
21
22
23
24

Plaintiffs respectfully request:

(1)   that Paul, Jr. have judgment against the Defendants, jointly and severally, for an amount not less than the sum of (a) his actual damages as set forth above; (b) statutory treble damages under 18 U.S.C. §1964(c); (c) punitive damages in an amount not less than three times his actual damages; (d) pre- and post-judgment interest at the highest lawful rate; and (e) reasonable attorneys' fees; and

25
26

(2)   that the Court grant Paul Jr. court costs and such other and further relief to which he may be entitled.

27
28

FIRST AMENDED COMPLAINT          56          Case No. 5:21-cv-04540-BLF

**JURY DEMAND**

Plaintiff requests a trial by jury.


**RENEWED NOTICE TO DEFENDANTS TO PRESERVE ALL DOCUMENTS AND ELECTRONIC STORAGE OF INFORMATION**

You are hereby put on notice that you should preserve and not destroy, or allow the destruction of or removal from your files, any documents or electronic storage of information which may, directly or indirectly, have any relevance or bearing on any of the facts, matters or issues set forth in the above Complaint, or may reasonably lead to discovery of the facts, matters or issues which may be relevant to the facts, matters or issues set forth in the above Complaint.


Dated: November 30, 2021                    COHORN LAW

                                           By:  /s/ Cari A. Cohorn

                                               Attorneys for PLAINTIFF
                                               Paul Mula, Jr.