**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

|  |  |
|---|---|
| PAUL MULA,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>HELENE MULA-STOUKY, et al.,<br><br>　　　　　Defendants. | Case No.  21-cv-04540-BLF<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS CORRECTED SECOND AMENDED COMPLAINT WITHOUT LEAVE TO AMEND; AND DISMISSING ACTION**<br><br>[Re:  ECF 170] |

Plaintiff Paul Mula, Jr. ("Paul Jr.") claims that two sets of defendants entered into two separate RICO[1] conspiracies to deprive him of assets that his deceased grandmother, Sarah Marie Ogier ("Sarah"), left in trust for him.  The corrected second amended complaint ("CSAC") alleges that an "original conspiracy" was entered into by Sarah's three children:  Paul Mula, Sr. ("Paul Sr."), now deceased, who was Paul Jr.'s father; Alan Mula ("Alan"), who is Paul Jr.'s uncle; and Helene Mula-Stouky ("Helene"), now conserved, who is Paul Jr.'s aunt.[2]  *See* CSAC ¶ 2.  The alleged goal of the original conspiracy was to loot the trust established by Sarah and thus thwart what Paul Jr. claims was Sarah's intention to skip a generation and leave the bulk of her assets to him.  *Id.*  Paul Jr. asserts that his father, Paul Sr., murdered Sarah in furtherance of that conspiracy.  *See id.* ¶ 112.2.

The CSAC alleges that a later "cover-up conspiracy" was entered into by the professionals appointed by the Probate Court in connection with the conservatorship of Helene, including:

---

[1] Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq*.

[2] For clarity, the Court refers to some parties by their first names; the Court means no disrespect.

1    Robert E. Temmerman ("Temmerman"), the appointed attorney for Helene; Patricia Bye ("Bye"),

2    the current Conservator of Helene's estate and the successor trustee of trusts established by Sarah

3    and Helene; and Christina Weiss Smith ("Smith"),[3] the Conservator of Helene's person and also

4    Paul Jr.'s half-sister.  *See* CSAC ¶ 13.

5        Several lawyers and law firms directly and tangentially involved in the probate of Sarah's

6    estate and the conservatorship of Helene allegedly aided and abetted, or conspired with, the

7    original conspirators and cover-up conspirators:  Terry Campbell Wallace ("Wallace"),[4] an

8    attorney retained first by Sarah and later by Helene; Alexandra Martin ("Martin"), Bye's attorney;

9    Aaron, Riechert, Carpol & Riffle, APC, Martin's law firm; Kristof Biorn ("Biorn"), an attorney

10   retained by Paul Jr.; and Crist, Schulz, Biorn & Shepherd APC, Biorn's law firm.  *See generally*

11   CSAC Count 1.   Temmerman's law firm, Temmerman, Cilley & Kohlmann, LLP, is not alleged

12   to have aided and abetted the RICO conspiracies, but is alleged to have conspired in the breach of

13   fiduciary duties owed under state law.  *See generally* CSAC Counts 3, 4.

14       Paul Jr. sues Alan, Helene, Temmerman, Bye, Smith, Wallace, Martin, Aaron, Riechert,

15   Carpol & Riffle, APC, Biorn, Crist, Schulz, Biorn & Shepherd APC, and Temmerman, Cilley &

16   Kohlmann, LLP for RICO violations and related state law claims.  The CSAC alleges the

17   existence of federal question jurisdiction over Count 1, brought under RICO, and supplemental

18   jurisdiction over Counts 2-8, brought under state law.  *See* CSAC ¶ 4.  All Defendants have joined

19   in a motion to dismiss the CSAC under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

20       The motion to dismiss is GRANTED WITHOUT LEAVE TO AMEND on the basis that

21   the RICO claim fails to satisfy the pleading standard under Rule 12(b)(6), further leave to amend

22   the RICO claim is not warranted, and the Court declines to exercise supplemental jurisdiction over

23   the state law claims absent a viable federal claim.

---

[3] The Court refers to this defendant as "Smith" in deference to her expressed preference throughout this lawsuit, although Paul Jr. continues to refer to her by her birth name, "Weiss," in his pleadings and briefs.

[4] The Court refers to this defendant as "Wallace" in deference to her expressed preference throughout this lawsuit, although Paul Jr. continues to refer to her by her birth name, "Campbell," in his pleadings and briefs.

United States District Court
Northern District of California

I.    **BACKGROUND**

Paul Jr. filed this action on June 11, 2021, and thereafter filed the operative FAC as of right. *See* Compl., ECF 1; FAC, ECF 53. Following the Court's dismissal of the FAC, Paul Jr. filed a second amended complaint and then, with leave of the Court, filed the operative CSAC. *See* SAC, ECF 163; CSAC, ECF 167. The CSAC is ninety pages in length, excluding exhibits. The Court summarizes the relevant allegations and exhibits below. The Court's summary also refers to documents filed in the Probate Court, as to which the Court grants Defendants' requests for judicial notice as discussed below. *See* Defs.' RJN, ECF 170-2; Defs.' Reply RNJ, ECF 175; Defs.' Third RJN, ECF 190.

*August 2000 Creation of Ogier Trust*

Paul Jr.'s grandmother, Sarah, established the Ogier Revocable Trust ("Ogier Trust") on August 17, 2000, naming herself and her daughter Helene as co-Trustees.[5] *See* CSAC Ex. A (Declaration of Trust). The Declaration of Trust identified four real properties and a Charles Schwab brokerage account to be placed in the trust. *See id.* Ex. A. A General Assignment that Sarah executed on August 17, 2000 also transferred to the trust, with certain exclusions, "all her right, title, and interest in her assets of every kind and description and wherever located, whether real or personal, tangible or intangible, choate or inchoate, including without limitation, cash or cash equivalents[.]" *See* CSAC Ex. B (General Assignment). The General Assignment expressly excluded from the transfer to the Ogier Trust the following: "a. All furniture, furnishings, fixtures, and other tangible personal property"; and "b. Any and all assets which have provisions for a non-probate transfer including those assets which are set forth in Sections 5000 et. seq. of the Probate Code of the State of California." *Id.* Finally, the Last Will and Testament ("Will") executed by Sarah on August 17, 2000 bequeathed to Helene "all of [Sarah's] automobiles, household and personal effects and other tangible personal property of like manner," and gave the residue of the estate to the Ogier Trust. CSAC Ex. C (Will).

---

[5] The CSAC alleges throughout that the Ogier Trust was created on August 7, 2001. *See, e.g.,* CSAC ¶¶ 2, 25, 114. However, the Ogier Trust document attached as exhibits to the CSAC are dated August *17, 2000.*

The Declaration of Trust directed that, during Sarah's lifetime, the co-Trustees would pay Sarah as much of the net income and principal of the Ogier Trust estate as she desired, in quarter-annual or more frequent installments. *See* Declaration of Trust Art. II.A. The Declaration of Trust further directed that, upon Sarah's death, the Ogier Trust estate was to be distributed as follows: one of the four real properties placed in the trust was to be given to Helene, Paul Sr. and Alan jointly in equal shares, and the balance of the Ogier Trust estate was to be distributed to Helene. *Id*. Art. III.A. The Ogier Trust estate passing to Helene was not to be distributed to her outright, but rather was to be placed in the Helene Mula-Stouky Trust ("Stouky Trust") and used for Helene's "health, maintenance, support and education" for Helene's lifetime. *Id*. Art. III.B.

Sarah designated Helene as the Trustee of the Stouky Trust and provided that:

> 1. The Trustee shall pay to HELENE MULA-STOUKY, or apply for her benefit, quarter-annually or at more frequent intervals, *so much of the net income* as the Trustee in the Trustee's *absolute discretion* may deem necessary or advisable for the proper health, maintenance, support and education of HELENE MULA-STOUKY. The balance of net income, if any, shall be accumulated by the Trustee and added to the principal of the Trust. If the net income in the discretion of the Trustee is not sufficient to provide for the proper health, maintenance, support and education of HELENE MULA-STOUKY, then the Trustee shall pay to or apply for her benefit *so much of the principal as the Trustee deems to be necessary* for the aforementioned purposes.

Declaration of Trust Art. III.B.1 (italics added). Upon Helene's death, the balance of the undistributed principal and income of the Stouky Trust is to be distributed to Paul Jr., if he is then living. *Id*. Art. III.B.2.

*June 2005 Grant Deeds to Four Real Properties*

On June 18, 2005, Sarah signed grant deeds transferring to Helene, Paul Sr., and Alan the four real properties she had placed in the Ogier Trust when it was established. *See* CSAC ¶ 28. *See id.* ¶ 33.

*July 2005 Death of Sarah*

Sarah died on July 5, 2005 at the age of eighty-eight. *See* CSAC ¶¶ 29(a), 33. Prior to her death, she suffered from arthritis, had difficulty walking due to hip and knee surgeries, and needed assistance with bathing, dressing, and preparing meals, but did not suffer from any known serious illness. *See id.* ¶ 32. On the day of her death, she suddenly stopped breathing and could not be

United States District Court
Northern District of California

revived.  *See id.* ¶ 37.

Paul Jr. claims that Sarah was murdered by Paul Sr., and specifically that Paul Sr. gave Sarah small doses of thallium over time and administered a larger dose of thallium in a glass of water on the morning of the day she died.  *See id.* ¶¶ 12(e), 36-42.  The CSAC does not allege that thallium was found in Sarah's system or that there was any kind of investigation into her death in 2005.  The assertion of murder appears to be based primarily on statements of Sarah's caregiver, Dianne Seymour, that:  Sarah said Paul Sr. was hovering over her; Sarah remarked that Alan had visited her twice although she had not seen him for a year before that; Sarah said she was generally afraid and that things were "eerie"; Sarah displayed impairment of thought and mood, felt numbness in her arms and legs, and had some hair loss in the weeks before she died; Paul Sr. gave Sarah a glass of water the morning she died; Sarah's hair came out in clumps right before she died; Paul Sr. chastised Seymour for giving Sarah CPR; and Seymour experienced diarrhea for several hours after giving Sarah CPR.  *See id.* ¶¶ 35-38.

Paul Jr. speculates that Sarah's symptoms in the weeks before her death could have been caused by thallium poisoning; the glass of water Paul Sr. gave Sarah could have been dosed with thallium; and Seymour's diarrhea after giving Sarah CPR could have been caused by thallium absorbed through her skin while giving mouth-to-mouth resuscitation.  *See id.* ¶¶ 41-42.  The CSAC does not allege that a police report has been filed regarding Sarah's alleged murder, and counsel confirmed at the hearing on Defendants' motion that no police report has been filed.  Paul Jr. states that his counsel has retained a consulting pathologist and is in the process of seeking to exhume Sarah's body so that it can be autopsied.  *See id.* ¶ 43.  The CSAC states that even though Sarah died more than seventeen years ago, there is a high probability that forensic evidence still would be recoverable.  *See id.*

*Alleged Looting of Ogier Trust Assets*

Paul Jr. asserts that Paul Sr., Helene, and Alan looted the Ogier Trust both before and after Sarah's death.

Real Properties:  Paul Jr. alleges that Sarah signed the grant deeds transferring the four real properties only because Paul Sr. and Alan pressured her and lied to her.  *See* CSAC ¶ 29(e).

United States District Court
Northern District of California

5

According to Paul Jr., Sarah did not want to sign the grant deeds and for that reason marked them with an "X" instead of signing her name.  *See id.* ¶¶ 29(g), (h), 30.  Sarah allegedly told her caregiver, Seymour, that marking the deeds was just a way to get rid of Paul Sr. and Alan.  *See id.* ¶ 30.

When Helene, Paul Sr., and Alan tried to sell one of the real properties, they discovered that the grant deeds improperly listed the transferor as Sarah individually rather than Sarah as co-Trustee of the Ogier Trust.  *See* CSAC ¶ 44.  In January 2006, Helene filed a petition in the Probate Court, requesting confirmation of the June 18, 2005 transfer of the four real properties to Helene, Paul Sr., and Alan as tenants in common.  *See id.* ¶ 46.  Helene was represented by Wallace, who previously had been retained by Sarah to draft the Ogier Trust and other estate planning documents.  *See id.* ¶¶ 7.10, 12(h).  The petition recited a list of persons entitled to notice of the hearing on the petition, including Helene, Paul Sr., Alan, Paul Jr., and two contingent beneficiaries, JoAnn A. Fairbanks ("Fairbanks") and Danny Ash ("Ash").  *See* Defs.' RJN Ex. 2 (Petition).  The Probate Court granted the petition on March 16, 2006, noting that no one appeared in opposition to the petition.  *See id.* ¶ 54; *see also* Defs.' RJN Ex. 3 (Probate Court Order of Mar. 16, 2006).  Paul alleges that he would have opposed the petition had he known of it, but that Wallace failed to serve the petition on him, Fairbanks, or Ash.  *See* CSAC ¶¶ 47-51.

Jewelry:  The CSAC alleges that shortly after Sarah's death, Paul Sr. and Alan stole a bag of jewelry that Sarah kept under her mattress.  *See* CSAC ¶ 12(f).  The jewelry allegedly was worth more than $500,000.  *See id.*  Paul Jr. asserts that the jewelry belonged to the Ogier Trust.  *See id.*  As noted above, Sarah's "tangible personal property" was excluded from the Ogier Trust, and her "automobiles, household and personal effects and other tangible personal property of like manner" were bequeathed to Helene.  It is Paul Jr.'s position that Sarah's jewelry does not fall within the category of tangible personal property that was outside of the Ogier Trust.

Mercedes:  The CSAC alleges that Helene, Paul Sr., and Alan stole another Ogier Trust asset, a 1956 Mercedes Benz Gullwing vehicle that would be worth at least $1.9 million today.  *See* CSAC ¶ 12(g).  Again, Sarah's "tangible personal property" was excluded from the Ogier Trust, and her "automobiles, household and personal effects and other tangible personal property

United States District Court
Northern District of California

United States District Court
Northern District of California

1    of like manner" were bequeathed to Helene.  Paul Jr. nonetheless takes the position that the

2    Mercedes was held in the Ogier Trust.

3          <u>Charles Schwab Account</u>:  The CSAC alleges that Helene embezzled the contents of a

4    Charles Schwab account that was valued at $317,000 shortly before Sarah died.  *See* CSAC ¶

5    12(g).  That account and all other Ogier Trust assets were to be distributed to Helene upon Sarah's

6    death and held by Helene in the Stouky Trust.  As the Trustee of the Stouky Trust, Helene had

7    absolute discretion to use as much of the Stouky Trust income and principal as she deemed

8    necessary for her "health, maintenance, support and education."  As discussed below, the Probate

9    Court approved accountings of the Ogier Trust and the Stouky Trust.  Under these circumstances,

10   it is unclear how Sarah's use of the Schwab funds constituted embezzlement.

11         *February 2012 Conservatorship of Helene*

12         On February 17, 2012, an *ex parte* conservatorship proceeding was commenced against

13   Helene.  *See* CSAC ¶ 58.  Temmerman was appointed by the Probate Court to serve as Helene's

14   attorney.  *See id.*  The Probate Court conserved Helene and appointed Smith, Paul's half-sister, as

15   the Conservator of Helene's person.  *See id.* ¶ 60.  An individual named John Kessler initially was

16   appointed as the Conservator of Helene's estate, but shortly thereafter the Probate Court appointed

17   Bye to that position.  *See id.* ¶¶ 60-61.  The Probate Court later appointed Bye as the successor

18   Trustee of both the Stouky Trust and the Ogier Trust.  *See id.* ¶¶ 7.7, 13, 66, 76.

19         On November 8, 2012, the Probate Court issued an order granting Temmerman's petition

20   for an order directing Bye, as the Conservator of Helene's estate, to execute both a First

21   Amendment and Restatement of the Stouky Trust and a Will on behalf of Helene.  *See* Defs.' RJN

22   Ex. 7 (Probate Court Order of Nov. 8, 2012).  The effect of those documents was to place all

23   assets of Helene's estate, including certain listed real properties, in the Stouky Trust.  *See id*.

24   Among the listed real properties was Helene's interest in the Juanita property, which was one of

25   the four real properties that Sarah transferred by grant deed in 2005.  *See id*.  Paul Jr. was served

26   with a copy of the Probate Court's order.  *See id*.

27         *Paul Jr.'s 2012 Consultation with Biorn*

28         Paul Jr. alleges that at some unspecified date in 2012, he learned about the four grant deeds

that Sarah executed in 2005.  *See* CSAC ¶ 17(c).  It is unclear whether he learned about the grant

deeds from the Probate Court's order of November 8, 2012 discussed above, or from some other

source.  Paul Jr. states that he approached Temmerman about the transfer, and Temmerman

referred him to Biorn.  *See id.*  Biorn allegedly advised Paul Jr. that the statute of limitations had

run on any claim relating to the 2005 grant deeds.  *See id.*  According to Paul Jr., the statute of

limitations had not in fact run, and Biorn deliberately misadvised him at the direction of

Temmerman.  *See id.*

     *Paul Jr.'s Unsuccessful Objections and Challenges to Numerous Probate Court Orders*

     The Probate Court thereafter issued a number of orders that were unsuccessfully

challenged by Paul Jr.

     <u>Probate Court's Order Re Second Amendment to Stouky Trust and Codicil</u>:  On July 31,

2019, the Probate Court issued an order granting Temmerman's petition for an order directing

Bye, as the Conservator of Helene's estate, to execute both a Second Amendment and Restatement

of the Stouky Trust and a First Codicil to Helene's Will.  *See* Defs.' RJN Ex. 10 (Probate Court

Order of Jul. 31, 2019).  The petition was in response to the death of Paul Sr., and ensured that

Paul Sr.'s children would receive a portion of Helene's assets that otherwise would have gone to

Alan.  *See id.*  The petition was granted over Paul Jr.'s objections, and he filed an appeal.  *See*

Defs.' RJN Ex. 12 (Cal. Court of Appeal Dec. of Sept. 14, 2022).

     The California Court of Appeal affirmed the Probate Court's Order.  *See* Defs.' RJN Ex.

12 (Cal. Court of Appeal Dec. of Sept. 14, 2022).  The Court of Appeal observed that Paul Jr.'s

primary objections in the Probate Court were that the changes to Helene's estate plan omitted

allocation to him of a specific real property that he claimed Helene wanted him to have, and

allocated Helene's residence to Smith, his half-sister and the Conservator of Helene's person.  *See*

*id.* at 2.  Paul Jr. asserted that Helene wanted him to be a primary donee, and that Smith should not

receive anything because she was not close to Helene, was not a blood relative, and was

"prohibited as a donee."  *Id.* at 2-3.  Temmerman advised the Probate Court that Paul Jr. had

visited Helene only once in the five years since she was conserved and opined that Paul Jr. should

not "receive a dime."  *Id.* at 5.  Smith filed a declaration in the Probate Court "describing at length

8

her long, warm, intimate, and continuing relationship with Helene." *Id*. at 4.

Paul Jr. argued on appeal that the Probate Court abused its discretion by denying his request for an evidentiary hearing on these issues before granting the petition. *See id*. at 6. The Court of Appeal determined that the Probate Court gave Paul Jr. ample opportunity at the hearing on the petition to present the factual and legal bases for his objection, and that Paul Jr. "made no attempt to introduce any evidence at the July 31, 2019 hearing even though he had been notified of it over four months earlier." *Id*. at 10. The Court of Appeal concluded that "[t]he verified petition, the declarations, and the court records from the 2012 substituted judgment proceedings provided a substantial evidentiary basis for the court to determine whether Temmerman had met his burden of establishing that Helene's intent would be served by the proposed substituted judgment," and that Paul Jr. had failed to establish that the Probate Court abused its discretion by declining to conduct an evidentiary hearing. *Id*.

Probate Court's Order Approving Trust Accounting Re Stouky Trust:  On October 25, 2019, the Probate Court granted Bye's petition for approval of a third trust accounting regarding the Stouky Trust, covering a two-year period from June 2017 to June 2019. *See* Defs.' RJN Ex. 15 (Probate Court Order of Oct. 25, 2019). Paul Jr. opposed the petition, arguing among other things that Bye had not adequately explained why the Stouky Trust spent more than $93,000 to repair the Juanita Avenue property while charging Smith only half the market rate in monthly rent. *See* Defs.' RJN Ex. 16 (Cal. Court of Appeal Dec. of Sept. 14, 2022). The Juanita Avenue residence had a market value of $540,000, and Smith paid $1,957 a month in rent. *See id*. at 1. Paul Jr. appealed the Probate Court's approval of the third trust accounting for lack of sufficient evidence. *See id*. at 4. The California Court of Appeal affirmed the Probate Court's order, finding that the order was supported by substantial evidence. *See id*. at 4. The Court of Appeal noted that the Stouky Trust also owned a residence on Arbor Drive, which had a fair market value of $825,000, and which Paul Jr. rented for between $200 and $500 a month. *See id*. at 2.

Probate Court's Order Approving Trust Accounting Re Ogier Trust and Terminating Trust: On November 14, 2022, the Probate Court granted Bye's petition for approval of the first trust accounting regarding the Ogier Trust, for ratification of Bye's acts as Trustee of the Ogier Trust,

1    and for termination of the Ogier Trust.  *See* Defs.' RJN Ex. 19 (Probate Court Order of Nov. 14,

2    2022).  On August 2, 2023, the Probate Court denied Paul Jr.'s request to set aside that order.  *See*

3    Defs.' Third RJN Ex. 28 (Probate Court Order of Aug. 2, 2023), ECF 190.

4        <u>Probate Court's Orders Granting Authority to Retain Attorneys to Defend Against Paul Jr.</u>:

5    The Probate Court issued several orders granting Bye's petitions for authority to retain and pay

6    attorneys to defend against Paul Jr.'s federal lawsuit (the present suit), and against his numerous

7    appeals of the Probate Court's orders.  *See* Defs.' Reply RJN Ex. 26 (Cal. Court of Appeal Dec. of

8    May 15, 2023), ECF 175.  Those orders authorized Bye to retain and pay attorneys to defend the

9    Ogier Trust, the Stouky Trust, Helene, Bye, the attorneys representing them, and those attorneys'

10   law firms against the claims brought against them by Paul Jr. in the present federal suit.  *See id.* at

11   1.  The orders also authorized Bye to retain and pay attorneys to defend against Paul's appeals

12   from multiple probate court orders.  *See id.*  The California Court of Appeal affirmed the Probate

13   Court's retention and payment orders, finding that the Probate Court did not abuse its discretion in

14   issuing the five orders challenged by Paul Jr.  *See id.* at 15.  The Court of Appeal noted that Paul

15   Jr. had filed at least seven appeals from orders of the Probate Court relating to the Stouky Trust

16   and the Ogier Trust.  *See id.* at 8.  The Court of Appeal did not address whether Paul Jr. should be

17   considered a vexatious litigant however, observing that "[r]egardless of whether Paul may in the

18   future be declared a vexatious litigant, the probate court did not make any such finding, so this

19   issue is not before us in these appeals."  *Id.*

20       Paul Jr.'s petition for review was denied by the California Supreme Court on August 23,

21   2023.  *See* Defs.' Third RJN Ex. 29 (Supreme Court Docket Sheet).

22       *The Present Action*

23       In the present action, Paul Jr. asserts the following claims in his CSAC:  (1) RICO

24   violations; (2) breach of fiduciary duties; (3) aiding and abetting breach of fiduciary duties;

25   (4) conspiracy to breach fiduciary duties; (5) intentional interference with expectancy of

26   inheritance; (6) unfair competition; (7) legal malpractice; and (8) successor trustee liability.

27       With respect to the sole federal claim brought under RICO, Paul Jr. alleges the existence of

28   two separate RICO conspiracies.  Paul Sr., Alan, and Helene allegedly entered into the "original

United States District Court
Northern District of California

10

conspiracy" sometime between Sarah's creation of the Ogier Trust and Sarah's execution of the four grant deeds in June 2005.  *See* CSAC ¶ 9.  The alleged goal of the original conspiracy was to obtain control of the assets in the Ogier Trust and thwart what Paul Jr. claims was Sarah's desire to leave him the bulk of her estate.  *See id*.  The original conspiracy allegedly lasted until 2012, when Helene was conserved.  *See id*. ¶ 11.

Temmerman, Bye, and Smith allegedly entered into the "cover-up conspiracy" at some point between February 2012 and February 2013.  *See* CSAC ¶ 13.  The alleged goal of the cover-up conspiracy was to conceal the original conspirators' wrongdoing, including the alleged murder of Sarah, and to prevent Paul Jr. from obtaining the assets of the Ogier Trust Sarah allegedly intended for him.  *See id*. ¶ 13.  According to Paul Jr., the cover-up conspiracy continues to operate through the present date.  *See id*. ¶ 16.

The conspirators allegedly were aided and abetted by Wallace, Martin, Aaron, Riechert, Carpol & Riffle, APC, Biorn, and Crist, Schulz, Biorn & Shepherd APC.  *See generally* CSAC Count 1.

*The Present Motion*

All Defendants jointly move to dismiss the CSAC for lack of subject matter jurisdiction under Rule 12(b)(1) and failure to state a claim under Rule 12(b)(6).

## II.    LEGAL STANDARD

### A.    Rule 12(b)(1)

A party may challenge the Court's subject matter jurisdiction in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1).  "A Rule 12(b)(1) jurisdictional attack may be facial or factual."  *Safe Air For Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction."  *Id*.  "By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction."  *Id*.

### B.    Rule 12(b)(6)

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted tests the legal sufficiency of a claim."  *Conservation Force*

*v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011) (quotation marks and citation omitted).  While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.

When evaluating a Rule 12(b)(6) motion, the district court is limited to the allegations of the complaint, documents incorporated into the complaint by reference, and matters which are subject to judicial notice.  *See Louisiana Mun. Police Employees' Ret. Sys. v. Wynn*, 829 F.3d 1048, 1063 (9th Cir. 2016) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).  The Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citations omitted).

## III.   DISCUSSION

Defendants move to dismiss the CSAC on several grounds.  First, Defendants contend that the CSAC is subject to dismissal under Rule 12(b)(1) because the Court lacks subject matter jurisdiction over Paul Jr.'s claims pursuant to the *Rooker-Feldman* doctrine.  Second, Defendants contend that the CSAC is subject to dismissal under Rule 12(b)(6), asserting several global arguments for dismissal before addressing the individual claims.  For example, Defendants argue that all claims are barred by the doctrine of collateral estoppel.  They also argue that Paul Jr.'s claims for damages are too speculative because he is a residual beneficiary of the Ogier Trust and thus he is entitled to only those Ogier Trust assets (if any) still held by Helene when she dies.  Other global arguments include Defendants' assertions that Paul Jr.'s claims are contrary to the terms of the Ogier Trust excluding "tangible property" from the trust estate, that Paul Jr. had notice of the 2005 grant deeds and 2006 petition, and that Temmerman has quasi-judicial immunity from Paul Jr.'s state law claims.  Third, Defendants assert that the claims of the CSAC are not adequately alleged.

1       In opposition, Paul Jr. argues that Defendants' Rule 12(b)(1) arguments based on the

2  *Rooker-Feldman* doctrine were rejected by the Court in a prior order and that Defendants' renewal

3  of those arguments is nothing more than an improper requests for reconsideration.  Paul Jr. also

4  asserts that Defendants' global arguments are without merit.  Finally, Paul Jr. contends that each

5  of his claims is adequately alleged.

6       Before taking up these substantive arguments, the Court addresses the parties' requests for

7  judicial notice and evidentiary submissions.

8      **A.**      **Requests for Judicial Notice**

9            **1.**      **Defendants' Requests for Judicial Notice**

10      Defendants have filed three requests for judicial notice, all directed to documents filed in

11  the California Probate Court, the California Court of Appeal, and the California Supreme Court.

12  *See* Defs.' RJN, ECF 170-2; Defs.' Reply RJN, ECF 175; Defs.' Third RJN, ECF 190.  The Court

13  "may take judicial notice of undisputed matters of public record, including documents on file in

14  federal or state courts."  *Harris v. Cnty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) (citation

15  omitted).  Accordingly, Defendants' requests for judicial notice are GRANTED.

16      Paul Jr. opposes Defendants' requests for judicial notice, both in his opposition brief and in

17  several separately filed objections.  *See* Opp. at 6, 25; Obj. to Reply Evid., ECF 179; Obj. to Exs.

18  28 and 29, ECF 187; Decl. of Gerald North, ECF 191; Renewed Obj. to Ex. 28, ECF 192; Obj. to

19  Ex. 32, ECF 194; Obj. to Ex. 31, ECF 195.  Paul Jr. does not challenge the authenticity of the state

20  court filings that are the subject of Defendants' requests for judicial notice, nor does he dispute the

21  well-established rule that state court filings are a proper subject for judicial notice.  Instead, he

22  argues that the state court decisions do not provide an appropriate basis for application of the

23  doctrine of collateral estoppel.  As discussed below, the Court finds that dismissal of the CSAC is

24  warranted on grounds other than collateral estoppel and therefore does not consider the judicially

25  noticeable state court decisions for collateral estoppel purposes.  The Court considers the state

26  court decisions solely as part of the background and context for the claims asserted by Paul Jr. in

27  the present action.

28

1

### 2.      Paul Jr.'s Request for Judicial Notice

2      Paul Jr. requests judicial notice of additional documents filed in the state courts and a

3   transcript of a state court proceeding.  *See* Pl.'s RJN, ECF 172-2.  Paul Jr.'s request for judicial

4   notice is GRANTED.  *See Harris*, 682 F.3d at 1132 ( judicial notice may be taken of matters of

5   public record, including state court filings).

6      **B.      Other Evidence**

7      In addition to their requests for judicial notice, both parties submit evidence in the form of

8   declarations.  Defendants submit a declaration of Biorn regarding his 2012 representation of Paul

9   Jr., Biorn Decl., ECF 171, and a declaration of Daniel D. Marcus regarding production of Biorn's

10  client file to Paul Jr., ECF 177.  Paul Jr. submits his own declaration.  *See* Mula Decl., ECF 273.

11  While extrinsic evidence may be considered with respect to a motion to dismiss under Rule

12  12(b)(1), it may not be considered with respect to a motion to dismiss under Rule 12(b)(6).

13     **C.      Rule 12(b)(1) Motion**

14     Defendants move to dismiss the CSAC under Rule 12(b)(1), asserting that the Court lacks

15  subject matter jurisdiction over Paul Jr.'s claims pursuant to the *Rooker-Feldman* doctrine.  "The

16  *Rooker-Feldman* doctrine derives its name from two Supreme Court cases:  *Rooker v. Fidelity*

17  *Trust Company*, 263 U.S. 413, 44 S. Ct. 149, 68 L. Ed. 362 (1923), and *D.C. Court of Appeals v.*

18  *Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983)."  *Benavidez v. Cnty. of San*

19  *Diego*, 993 F.3d 1134, 1142 (9th Cir. 2021).  The doctrine "bars lower federal courts from

20  exercising jurisdiction to review the final determinations of a state court in judicial proceedings."

21  *Id*. (internal quotation marks and citation omitted).  "Plaintiffs thus cannot come to federal court to

22  seek what in substance would be appellate review of the state judgment." *Id*. (internal quotation

23  marks and citation omitted).

24     The Ninth Circuit has "provided the following general formulation of the *Rooker-Feldman*

25  doctrine:  If a . . . plaintiff asserts as a legal wrong an allegedly erroneous decision by a state court

26  . . . , *Rooker-Feldman* bars subject matter jurisdiction in federal district court.  If . . . [a] plaintiff

27  asserts as a legal wrong an allegedly illegal act or omission by an adverse party, *Rooker-Feldman*

28  does not bar jurisdiction."  *Benavidez*, 993 F.3d at 1142 (internal quotation marks and citation

United States District Court
Northern District of California

United States District Court
Northern District of California

1    omitted).  "[W]here a party alleges extrinsic fraud by an adverse party in procuring a state court

2    judgment, the *Rooker-Feldman* doctrine does not apply, because such a claim does not challenge

3    the state court decision directly."  *Id.* at 1143.

4         Defendants raised the *Rooker-Feldman* doctrine as a basis for dismissal in a prior motion

5    to dismiss the first amended complaint.  The Court denied the motion on *Rooker-Feldman*

6    grounds, noting that Paul Jr. was not seeking to invalidate any particular state court order, but was

7    seeking damages on the theory that Defendants conspired to defraud him of trust assets to which

8    he was entitled, and engaged in fraud on the Probate Court in order to further that conspiracy.  *See*

9    Order Granting in Part and Denying in Part Stouky Defs.' Mot. to Dismiss FAC, ECF 155.  In

10   particular, the Court cited to Paul Jr.'s allegations that he was not served with notice of Helene's

11   2006 petition requesting that the Probate Court confirm Sarah's 2005 transfer of real properties

12   out of the Ogier Trust, even though Defendants certified that he was served.  *See id.*  The Court

13   found that given the way Paul Jr.'s claims were framed, they were not clearly barred by the

14   *Rooker-Feldman* doctrine.  *See id.*

15        Defendants acknowledge the Court's prior ruling, but assert that judicially noticeable

16   documents submitted with the present motion reflect that Paul Jr. raised the same extrinsic fraud

17   argument in the state courts, where it was rejected.  Defendants argue that any contrary

18   determination made by this Court on that issue would run afoul of the *Rooker-Feldman* doctrine.

19   Defendants do not provide the Court with a pin citation to any state court decision expressly

20   determining that Paul Jr. was served with notice of the 2006 petition.  In their motion, Defendants

21   referred the Court to Exhibits 8-24 of their request for judicial notice, comprising approximately

22   700 pages.  *See* Defs.' Mot. at 2, ECF 170.  After the hearing, Defendants provided the Court with

23   a chart identifying certain issues and where they were litigated in the state courts.  *See* Ross Decl.

24   Ex. 29, ECF 185.  However, the chart combines the alleged fraud regarding service of the 2006

25   petition with a number of other issues, and cites to multiple state court documents as evidence that

26   those issues were litigated.  *See id.*  Those citations are insufficient to establish that Paul Jr.'s

27   current claim of fraud in the procurement of the Probate Court's ratification of the grant deeds

28   cannot be decided without undermining a state court decision.

Defendants' Rule 12(b)(1) motion to dismiss on *Rooker-Feldman* grounds is DENIED.

### D.     Rule 12(b)(6) Motion

Defendants argue a multitude of grounds for dismissal of the CSAC under Rule 12(b)(6). They first advance several arguments that apply to the CSAC globally or at least to multiple claims. All of those arguments raise tricky issues. For example, Defendants argue that the claims of the CSAC are barred by the doctrine of collateral estoppel, directing the Court to approximately 1,000 pages of state court filings. The Court finds it virtually impossible to correlate the key issues in the present case with the relevant portions of the state court rulings, even with the help of the chart submitted by Defendants after the hearing on their motion. Defendants' arguments regarding the speculative nature of Paul Jr.'s damages claims given his status as a residual beneficiary raised thorny issues of state law. Under these circumstances, and given the obvious deficiencies in the RICO claim that provides the only basis for federal jurisdiction, the Court finds that the most sensible approach is to begin its analysis with the RICO claim.

### 1.     RICO Claim (Count 1)

Count 1 of the CSAC asserts RICO violations against Helene and Alan, who allegedly entered into the original conspiracy running from some point in the early 2000s to 2012, and against Temmerman, Bye, and Smith, who allegedly entered into the cover-up conspiracy running from approximately 2012 to the present. The caption of Count 1 indicates that a number of lawyers and law firms – Wallace, Martin, Aaron, Riechert, Carpol & Riffle, APC, Biorn, and Crist, Schulz, Biorn & Shepherd APC – are liable for "aiding and abetting or conspiring with" the original conspirators and cover-up conspirators.

The Court first discusses the elements of a civil RICO claim, and then it addresses the RICO claims against the three groups of defendants in turn: the alleged members of the original conspiracy, the alleged members of the cover-up conspiracy, and the lawyers and law firms allegedly liable for aiding and abetting or conspiring with the primary conspirators.

### a.     Elements of a RICO Claim

The RICO Act makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct

16

1    or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of

2    racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).  "The terms of the Civil

3    RICO statute permit [a]ny person injured in his business or property by reason of a violation of §

4    1962 to recover treble damages."  *City of Almaty v. Khrapunov*, 956 F.3d 1129, 1132 (9th Cir.

5    2020).

6            "The elements of a civil RICO claim are as follows: (1) conduct (2) of an enterprise

7    (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to

8    plaintiff's business or property."  *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d

9    353, 361 (9th Cir. 2005) (internal quotation marks and citation omitted).  "To show the existence

10   of an enterprise under the second element, plaintiffs must plead that the enterprise has (A) a

11   common purpose, (B) a structure or organization, and (C) longevity necessary to accomplish the

12   purpose."  *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir.

13   2014).

14                   **b.        Alleged Original Conspiracy (Helene and Alan)**

15                          **i.        Conduct of an Enterprise**

16           The CSAC alleges that Helene, Alan, and Paul Sr. formed an association-in-fact enterprise

17   under RICO.  *See* CSAC ¶ 114.4.  "[A]n associated-in-fact enterprise is a group of persons

18   associated together for a common purpose of engaging in a course of conduct."  *Odom v.*

19   *Microsoft Corp.*, 486 F.3d 541, 552 (9th Cir. 2007) (internal quotation marks and citation

20   omitted).  "To establish the existence of such an enterprise, a plaintiff must provide both evidence

21   of an ongoing organization, formal or informal, and evidence that the various associates function

22   as a continuing unit."  *Id.* (internal quotation marks and citation omitted).  There is no requirement

23   that the enterprise have an "ascertainable structure."  *Id.* at 551-52.  The CSAC alleges that

24   Helene, Alan, and Paul Sr. had a familial relationship and worked together toward a common goal,

25   stripping the Ogier Trust of assets to benefit themselves.  *See* CSAC ¶¶ 114.4, 114.5.  Those

26   allegations are sufficient to satisfy the "enterprise" element of a civil RICO claim.

27                          **ii.        Pattern of Racketeering Activity**

28           A pattern of racketeering activity requires the commission of at least two predicate acts

1    within a ten-year period.  *See* 18 U.S.C. § 1961(5).  The CSAC alleges as predicate acts (1) Paul

2    Sr.'s murder of Sarah in violation of California Penal Code § 187; and (2) a slew of alleged

3    statutory violations premised on the theory that Helene, Alan, and Paul Sr. took trust assets to

4    which they were not entitled:  robbery under California law in violation of California Penal Code

5    § 211, money laundering in violation of 18 U.S.C. §1956(a), monetary transactions with unlawful

6    proceeds in violation of 18 U.S.C. §1957, interstate racketeering in violation of 18 U.S.C. §1952,

7    interstate transport of misappropriated funds in violation of 18 U.S.C. §2314, and criminal

8    conspiracy in violation of California Penal Code § 182.

9         The CSAC does not allege facts sufficient to give rise to a plausible assertion that Paul Sr.

10   murdered Sarah.  The pleading does not allege that Sarah's death was investigated or ruled

11   suspicious, or that thallium (or any poison) was found in Sarah's system.  The murder allegation

12   appears to be based on pure speculation grounded in the recollections of Sarah's caregiver, about

13   whom no details are provided, regarding events that occurred more than seventeen years ago.  The

14   murder accusation is undermined by the fact that Paul Jr. has not made a police report regarding

15   his suspicions.  Even if Paul Jr. had made a police report, and an investigation had been

16   commenced, there are no facts alleged in the CSAC suggesting that an investigation would be

17   fruitful.  While Paul Jr. alleges conclusorily that exhuming Sarah's body seventeen years after her

18   death could result in the recovery of forensic evidence, he provides no factual basis for believing

19   that such evidence could establish that Sarah was murdered or link Sarah's death to his father, who

20   is deceased.

21        Nor does the CSAC allege facts giving rise to a plausible claim that Helene, Alan, and Paul

22   Sr. took trust assets to which they were not entitled.  With respect to the four real properties that

23   were the subject of the grant deeds signed by Sarah in 2005, Paul Jr. does not dispute that Helene

24   executed the transfers.  The transfers were confirmed by the Probate Court in 2006.  Although

25   Paul Jr. asserts that the Probate Court's order confirming the transfers was obtained by fraud, in

26   light of the undisputed fact of the transfers and the Probate Court's confirmation of them, Helene

27   and Alan's taking possession of the real properties cannot plausibly be characterized as robbery,

28   money laundering or the other statutory violations.

United States District Court
Northern District of California

1   With respect to the bag of jewelry allegedly taken from under Sarah's mattress, the

2   Mercedes, and similar property, Paul Jr. has not alleged facts showing that those items were held

3   in the Ogier Trust.  As discussed above, Sarah's "tangible personal property" was excluded from

4   the Ogier Trust, and her  "automobiles, household and personal effects and other tangible personal

5   property of like manner" were bequeathed to Helene.  Under California law, "Every kind of

6   property that is not real is personal."  Cal. Civ. Code § 663.  Under that definition, "personal

7   property" includes "money, goods, chattels, things in action, and evidences of debt."  *Est. of*

8   *Dodge*, 6 Cal. 3d 311, 319 (1971).  Sarah's jewelry, automobiles, and similar property would fall

9   within this definition.

10   Paul Jr. argues that because the General Assignment executed by Sarah excluded from the

11   Ogier Trust  "All furniture, furnishings, fixtures, and other tangible personal property," the phrase

12   "tangible personal property" is limited to property like furniture, furnishings, and fixtures.  *See*

13   CSAC Ex. B (General Assignment).  Paul Jr. relies on *ejusdem generis*, a latin phrase meaning "of

14   the same kind" which is codified in California Civil Code § 3534, providing that "[p]articular

15   expressions qualify those which are general."  In *Dodge*, the California Supreme Court held that

16   the phrase "personal property" in a will need not be given the technical definition set forth in

17   California Civil Code § 663 where the will as a whole, and the circumstances under which it was

18   executed, indicated that the testator intended a different definition.  *See Dodge*, 6 Cal. 3d at 325.

19   If the phrase "tangible personal property" were used only in tandem with "furniture, furnishings,

20   and fixtures" as in the General Assignment, Paul Jr.'s argument might be persuasive.  However,

21   Sarah executed three documents concurrently when she established the Ogier Trust – the

22   Declaration of Trust, the General Assignment, and her Will.  *See* CSAC Exs. A (Declaration of

23   Trust), B (General Assignment), C (Will).  Sarah's will bequeathed to Helene "all of [Sarah's]

24   automobiles, household and personal effects and other tangible personal property of like manner,"

25   and gave the residue of the estate to the Ogier Trust.  CSAC Ex. C (Will).  Paul Jr. simply ignores

26   the Will when arguing for narrow interpretation of the phrase "tangible personal property."

27   Taking all of the documents executed by Sarah together, it is not plausible that she intended that

28   "tangible personal property" excluded automobiles and other personal property beyond furnishings

United States District Court
Northern District of California

19

1   and fixtures.  There is no allegation that any of the Trustees construed the term "tangible personal

2   property" in the manner argued by Paul Jr., and the Probate Court approved the accountings of the

3   Ogier and Stouky Trusts.

4        With respect to the funds in the Charles Schwab account that clearly was in the Ogier

5   Trust, that account and all other Ogier Trust assets were to be distributed to Helene upon Sarah's

6   death and held by Helene in the Stouky Trust.  As the Trustee of the Stouky Trust, Helene had

7   absolute discretion to use as much of the Stouky Trust income and principal as she deemed

8   necessary for her "health, maintenance, support and education."  The Probate Court approved

9   accountings of the Ogier Trust and the Stouky Trust.  Under those circumstances, Paul Jr. has not

10  alleged facts giving rise to a plausible claim that Sarah's use of the Schwab funds constituted

11  embezzlement.

12       In summary, the Court finds that the CSAC does not allege facts showing that Helene,

13  Alan, or Paul Sr. committed any predicate acts, let alone a pattern of racketeering activity.

14              **iii.**      **Injury to the Plaintiff's Business or Property**

15       Defendants argue that Paul Jr. cannot establish that the alleged RICO conspiracy caused

16  injury to his business or property.  "Our circuit requires that a plaintiff asserting injury to property

17  allege 'concrete financial loss.'"  *Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 975 (9th

18  Cir. 2008).  The crux of Paul Jr.'s claim is that Sarah wanted him to receive the bulk of her assets

19  and Defendants interfered with that intent by stealing and spending the assets of the Ogier Trust.

20  Defendants point out, however, that Paul Jr. is a residual beneficiary of the Ogier Trust.  He is

21  entitled only to those trust assets – if any – that remain at the time of Helene's death and he has no

22  present entitlement to any trust assets.  The CSAC alleges that "Helene, as trustee of the Ogier

23  Trust, was legally obliged to preserve [the Ogier Trust assets] for ultimate disposition to Paul."

24  CSAC ¶ 13.  The Court need not accept that allegation, as it is directly contradicted by the trust

25  documents themselves.  *See In re Gilead*, 536 F.3d at 1055 (court need not "accept as true

26  allegations that contradict matters properly subject to judicial notice").  As noted above, the Ogier

27  Trust was distributed to Helene to use for her "health, maintenance, support and education" during

28  her lifetime.  The Ogier Trust assets were placed in the Stouky Trust and Helene, as the original

United States District Court
Northern District of California

1  Trustee of the Stouky Trust, had virtually unfettered discretion to expend the trust interest and

2  principal.  Bye, the current Trustee of the Stouky Trust, has the same discretion, subject to the

3  orders of the Probate Court.  There is no obligation for the Trustees to preserve trust assets for

4  Paul Jr.  Paul Jr. does not allege that funds expended by the Trustees were not necessary for

5  Helene's health, maintenance, support, and education.  Accordingly, the Court finds that Paul Jr.

6  has failed to allege facts demonstrating that Helene and Alan caused injury to his business or

7  property.

8         Paul Jr. argues that he has alleged injury to his property, citing *Estate of Giraldin*, 55 Cal.

9  4th 1058, 1076 (2012), for the proposition that a remainder trust beneficiary has standing to sue

10  the trustee for breach of fiduciary duty.  Paul Jr. also cites *Grimmett v. Brown*, 75 F.3d 506 (9th

11  Cir. 1996), for the proposition that his RICO claim is ripe.  Those arguments are misplaced, as the

12  deficiency in Paul Jr.'s allegations of injury to property is not that he lacks standing or that his

13  RICO claim is unripe, but rather that he has not alleged facts showing that Defendants' actions

14  have deprived him of trust assets to which he otherwise would be entitled.

15                          **iv.    Statute of Limitations**

16         Even if Paul Jr. had alleged the elements of a RICO claim (and the Court concludes that he

17  has not), it appears on the face of the CSAC that his RICO claim against Helene and Alan is

18  barred by the statute of limitations.  "The statute of limitations for civil RICO actions is four

19  years." *Pincay v. Andrews*, 238 F.3d 1106, 1108 (9th Cir. 2001).  "[T]he civil RICO limitations

20  period begins to run when a plaintiff knows or should know of the injury that underlies his cause

21  of action." *Id*. (internal quotation marks and citation omitted).  The four real properties that

22  formed the bulk of the Ogier Trust were transferred out of the trust by grant deeds in 2005.  Paul

23  Jr. admittedly learned of those transfers at latest in 2012.  Knowledge of the real property transfers

24  from Sarah to Helene, Alan, and Paul Sr. was sufficient to put Paul Jr. on inquiry notice that

25  Helene, Alan, and Paul Sr. were conspiring to strip the Ogier Trust of its assets.  The statute of

26  limitations therefore began running on the RICO claim in 2012.  Paul Jr. did not file suit until

27  2021, long after the four-year limitations period expired.

28         Paul Jr. argues that the statute of limitations did not begin running until 2019, when he

21

1    says he first learned about Helene's 2006 petition to confirm the real property transfers.  *See*

2    CSAC ¶ 47.  However, Paul Jr. does not explain why knowledge of the petition was necessary for

3    his RICO claim to accrue.  His alleged RICO injury stems in large part from the property transfer

4    out of the Ogier Trust and to Helene, Alan, and Paul Sr.  He learned of that transfer by 2012.  Paul

5    Jr. cites no authority for the proposition that his RICO claim did not accrue until he learned the

6    exact mechanism of the transfer.

7         Accordingly, the motion to dismiss is GRANTED as to the RICO claim against Helene and

8    Alan based on the alleged original conspiracy.

9                    **c.    Alleged Cover-Up Conspiracy (Temmerman, Bye, and Smith)**

10                        **i.    Conduct of an Enterprise**

11        The CSAC alleges that Temmerman, Bye, and Smith operated the Ogier Trust as an

12   enterprise or, alternatively, operated as an association-in-fact enterprise, starting in the 2012 to

13   2013 time frame.  *See* CSAC ¶¶ 114.3, 114.4.  Temmerman, Bye, and Smith allegedly had a

14   "shared unlawful purpose of defeating Sarah's donative and testamentary intent to make sure Paul

15   receive little, if any, of his inheritance" *Id*. ¶ 14.4.  The CSAC contains no factual allegations that

16   would support this alleged purpose.  Paul Jr. does not allege that Temmerman, Bye, and Smith had

17   a pre-existing relationship, nor does he allege how depriving him of his "inheritance" would

18   benefit them.  Paul Jr. does not allege why Probate Court-appointed professionals would cover up

19   the alleged unlawful conduct of Helene, Paul Sr., and Alan, including murder.  At best, the CSAC

20   alleges that by obtaining control of the Stouky Trust Temmerman and Bye would reap legal fees

21   and Smith would become a beneficiary of Helene's Stouky Trust and/or Will.  Those allegations

22   are simply insufficient to satisfy the pleading requirements for RICO.

23                        **ii.    Pattern of Racketeering Activity**

24        Nor does the CSAC allege a pattern of racketeering activity.  Temmerman, Bye, and Smith

25   are alleged to have committed a number of predicate acts comprising statutory violations grounded

26   in their alleged conduct to defraud Paul and deprive him of trust assets to which he was entitled.

27   *See* CSAC ¶ 112.  Those alleged predicate acts are insufficient for the same reasons discussed

28   above with respect to the alleged predicate acts of Helene and Alan.  The CSAC does not plausibly

United States District Court
Northern District of California

allege that Temmerman, Bye, and Smith deprived Paul Jr. of assets to which he had a legal right. Paul Jr. has not alleged facts showing that Sarah did not in fact transfer the four real properties, that Sarah's jewelry, automobiles and other tangible personal assets belonged to the Ogier Trust, or that Helene and later Trustees did not have an absolute right to expend trust assets on Helene's behalf.

### iii.    Injury to the Plaintiff's Business or Property

Paul Jr.'s allegations regarding this element fail against Temmerman, Bye, and Smith for the same reasons discussed above with respect to Helene and Alan.  Paul Jr. has no present entitlement to any assets of the Ogier Trust.  The trustees have no obligation to preserve the Ogier Trust assets for distribution to him upon Helene's eventual death.  Accordingly, Paul Jr. has not alleged facts establishing that he has been injured in his business or property.

Accordingly, the motion to dismiss is GRANTED as to the RICO claim against Temmerman, Bye, and Smith based on the alleged cover-up conspiracy.

### d.    Alleged Aiding and Abetting or Conspiring (Lawyers/Firms)

Finally, the CSAC alleges that the lawyers and law firms involved in the case are liable for aiding and abetting or conspiring with the primary conspirators.  There is no civil liability for aiding and abetting a RICO violation.  Paul Jr. relies on *Baumer v. Pachl*, 8 F.3d 1341 (9th Cir. 1993), in which the Ninth Circuit noted in dicta "that there is some support among the Circuits for the imposition of aider or abettor liability in the civil RICO context." *Id.* at 1347.  *Baumer* preceded *Central Bank*, in which the Supreme Court stated that "when Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 182 (1994).  After *Central Bank*, numerous district courts within the Ninth Circuit have concluded that because the RICO statute does not expressly provide for civil aiding and abetting liability, there is no independent claim for aiding and abetting in the civil RICO context.  *See, e.g., In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 986 (N.D. Cal. 2018) ("[A] private cause of action for aiding and abetting a RICO violation is

1    unavailable[.]"); *Salas v. Int'l Union of Operating Engineers*, No. CV 12-10506 DDP VBKX,

2    2015 WL 728365, at *8 (C.D. Cal. Feb. 18, 2015) (same).  This Court agrees with the analysis of

3    those decisions and therefore finds that Paul Jr. cannot maintain a claim for aiding and abetting a

4    civil RICO violation.

5         With respect to the conspiracy allegation, to allege a claim for RICO conspiracy under §

6    1962(d), "Plaintiffs must allege either an agreement that is a substantive violation of RICO or that

7    the defendants agreed to commit, or participated in, a violation of two predicate offenses."

8    *Howard v. Am. Online Inc.*, 208 F.3d 741, 751 (9th Cir. 2000).  "[T]he failure to adequately plead

9    a substantive violation of RICO precludes a claim for conspiracy."  *Id*.  As discussed above, Paul

10   Jr. has failed to plead a substantive violation of RICO.

11        Accordingly, the motion to dismiss is GRANTED as to the aiding and abetting and

12   conspiracy claims against Wallace, Martin, Aaron, Riechert, Carpol & Riffle, APC, Biorn, and

13   Crist, Schulz, Biorn & Shepherd APC.

### e.    Leave to Amend is Not Warranted

15        Having determined that the RICO claim is subject to dismissal, the Court must decide

16   whether leave to amend is warranted.  Leave ordinarily must be granted unless one or more of the

17   following factors is present: (1) undue delay, (2) bad faith or dilatory motive, (3) repeated failure

18   to cure deficiencies by amendment, (4) undue prejudice to the opposing party, and (5) futility of

19   amendment.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Eminence Capital, LLC v.

20   Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (discussing *Foman* factors).  "[I]t is the

21   consideration of prejudice to the opposing party that carries the greatest weight."  *Eminence

22   Capital*, 316 F.3d at 1052.  However a strong showing with respect to one of the other factors may

23   warrant denial of leave to amend.  *Id*.

24        The Court finds no undue delay (factor 1) or bad faith (factor 2).  However, Paul Jr. has

25   failed to cure the deficiencies in his RICO claim despite guidance from the Court (factor 3).

26   Granting Paul Jr. an opportunity to continue with this meritless suit would impose undue prejudice

27   on Defendants (factor 4), because it is clear that amendment would be futile (factor 5).

28        Accordingly, the RICO claim is DISMISSED WITHOUT LEAVE TO AMEND.

United States District Court
Northern District of California

### 2. State Law Claims (Counts 2-8)

Absent a viable federal claim, the Court declines to exercise supplemental jurisdiction over Paul Jr.'s state law claims. "A district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction.'" *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir. 2010) (quoting 28 U.S.C. § 1367(c)(3) ). "'[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Id.* (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ). Here, the case is still at the pleading stage. Under these circumstances, the Court perceives no reason to exercise supplemental jurisdiction over Paul Jr.'s state law claims at this time, and it will dismiss the state law claims on that basis.

The state law claims are DISMISSED without prejudice to refiling in state court on the basis that the Court declines to exercise supplemental jurisdiction over them.

## IV. ORDER

(1) Defendants' motion to dismiss is GRANTED WITHOUT LEAVE TO AMEND on the basis that the RICO claim fails to satisfy the pleading standard under Rule 12(b)(6), further leave to amend the RICO claim is not warranted, and the Court declines to exercise supplemental jurisdiction over the state law claims absent a viable federal claim.

(2) This order terminates ECF 170.


Dated: October 10, 2023

_____
BETH LABSON FREEMAN
United States District Judge